IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 99-11229

———————————

D.E. RICE, Trustee for the Rice
Family Living Trust; KAREN RICE,
Trustee for the Rice Family
Living Trust,

                                        Plaintiffs-Appellants,

        versus

HARKEN EXPLORATION COMPANY,

                                        Defendant-Appellee.


———————————

Appeal from the United States District Court
for the Northern District of Texas

———————————

April 25, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

     Plaintiffs-appellants D.E. and Karen Rice (the Rices) filed
this suit against defendant-appellee Harken Exploration Company
(Harken) alleging that Harken discharged oil into or upon
"navigable waters" in violation of the Oil Pollution Act of 1990,
33 U.S.C. §§ 2701-2720 (OPA), and also asserting several related
state law claims.  Harken moved for summary judgment on all claims
and the district court granted its motion in part, on the ground

that under the court's interpretation of the OPA and the facts alleged plaintiffs could not sustain a cause of action under the OPA. In the same order the district court declined to exercise supplemental jurisdiction over the plaintiffs' state law claims and remanded those claims to state court. The Rices now appeal the district court's grant of summary judgment, and request that their OPA claim be remanded for trial. We affirm.

## Facts and Proceedings Below

Plaintiffs D.E. Rice and Karen Rice are trustees for the Rice Family Living Trust. The trust owns the surface rights to the property known as Big Creek Ranch in Hutchinson County, Texas. Harken Exploration Company is a Delaware corporation with its principal place of business in Irving, Texas. The Rice Family Living Trust purchased Big Creek Ranch for $255,000 in 1995.

Harken owns and operates oil and gas properties pursuant to leases on Big Creek Ranch. Under these leases, Harken maintains various structures and equipment on the property for use in exploration and pumping, processing, transporting, and drilling for oil. Harken began its operations on Big Creek Ranch in January 1996. Prior to Harken's operations, the Big Creek Ranch property had been used for oil and gas production for several decades.

Big Creek is a small seasonal creek on the Rices' property. Big Creek runs across the ranch to the Canadian River, which is the southern boundary of Big Creek Ranch. The Canadian River is down

gradient from Harken's oil and gas flow lines, tank batteries, and other production equipment. The Canadian River flows into the Arkansas River, which flows into the Mississippi River, which empties into the Gulf of Mexico. While the exact nature of Big Creek is unclear from the record, Harken does not dispute that the Canadian River is legally a "navigable water."

The Rices allege that Harken has discharged and continues to discharge hydrocarbons, produced brine, and other pollutants onto Big Creek Ranch and into "Big Creek," "unnamed tributaries of Big Creek" and other "independent ground and surface waters." They claim that Harken has contaminated or threatened 9,265.24 acre feet of groundwater and over ninety noncontiguous surface areas of the ranch. The plaintiffs do not allege that there has been any major event or events resulting in the discharge of oil onto Big Creek Ranch. Rather, the Rices allege that Harken damaged their land as a result of a series of smaller discharges that occurred over a considerable period of time. They allege that the cost to remediate the contamination of the soil and groundwater is $38,537,500.

Harken admits that there have been instances in which oil or produced brine was spilled or leaked from their tanks and other oil production equipment. Harken claims, however, that these discharges were of the sort that inevitably accompany any oil production operation and that in any case none of the discharges

ever threatened "navigable waters" within the meaning of the OPA.

Harken moved for summary judgment in the district court, claiming, *inter alia*, that the OPA was not intended to cover spills of oil onto dry land that occurred hundreds of miles from any coast or shoreline. The district court essentially agreed, and held that the Rices could not sustain a cause of action under the OPA on the facts shown. The district court dismissed the Rices' related state law claims without prejudice. This appeal followed.

## Discussion

We review an order granting summary judgment *de novo*. *Hernandez v. Reno*, 91 F.3d 776, 779 (5th Cir. 1996). Summary judgment is proper if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate in this case if the Rices have failed to produce summary judgment evidence of facts which, if viewed in the reasonable light most favorable to the Rices, do not suffice to establish a viable OPA claim. Where, as here, a proper motion for summary judgment has been made, the non-movant, in order to avoid summary judgment, must come forward with appropriate summary judgment evidence sufficient to sustain a finding in its favor on all issues on which it would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). On all material matters at issue here the Rices

would bear the burden of proof at trial.

The OPA was enacted in 1990 in response to the Exxon Valdez oil spill in Prince William Sound, Alaska, and was intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry. Senate Report No. 104-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 723. The OPA imposes strict liability on parties responsible for the discharge of oil: "[E]ach responsible party for ... a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines ... is liable for the removal costs and damages specified in subsection (b) that result from such incident."[1]  33 U.S.C. § 2702(a).  The OPA thus concerns facilities which discharge (or pose

_____

[1] Removal costs incurred by an injured party are only recoverable by a private party if they are consistent with the National Contingency Plan.  33 U.S.C. § 2702(b)(1)(B).  The "National Contingency Plan" refers to the responsibility of the President of the United States under 33 U.S.C. § 1321 (c) and (d) to publish a national plan for the removal of oil and hazardous substances from the waters of the United States where "a discharge, or a substantial threat of a discharge, of oil or a hazardous substance from a vessel, offshore facility, or onshore facility is of such a size or character as to be a substantial threat to the public health or welfare of the United States (including but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States...." 33 U.S.C. § 1321(c)(2)(A).  The purpose of the Plan is to "provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges...." *Id*. at § 1321(d)(2). Because of our resolution of this case, we do not reach the question of whether the Rices' proposed remediation is consistent with the National Contingency Plan.

a substantial threat to discharge) oil "into or upon . . . navigable waters," and liability under the OPA is therefore governed by the impact of such a discharge on "navigable waters." The OPA and its related regulations define navigable waters to mean "the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21); 15 C.F.R. § 990.30. The scope of the OPA is an issue of first impression for this Court.

The Rices argue that the district court's interpretation of the term "navigable waters" in the OPA was erroneous. They claim the court erred by refusing to apply the OPA to inland areas.[2] Since Congress used the same language in both the OPA and the Clean Water Act,[3] the Rices argue, the scope of both Acts should be similar and the OPA should apply to discharges into "waters of the United States" regardless of the distance of those waters from an ocean or similar body of water. The Rices also argue that the district court improperly excluded groundwater from "waters of the United States." Congress, the Rices claim, intended to extend its regulatory power to all waters that could affect interstate commerce when it enacted the OPA. Accordingly, the Rices would

---

[2] The district court appears to have construed the OPA as applying only to coastal or marine oil spills: "The Panhandle of Texas is hundreds of miles from costal waters or ocean beaches. Discharges of oil and salt water onto land in the Panhandle of Texas are not the type of oil and waste-water spills targeted by the OPA. ...Plaintiffs have no Oil Pollution Act cause of action under the facts of this case." *Rice v. Harken Exploration Co.*, 89 F.Supp.2d 820, 827 (N.D. Tex. 1999).

[3] 33 U.S.C. § 1251 *et seq.*

have this Court construe the OPA as imposing liability on facilities that discharge oil and related wastes into groundwater (or any other body of water) that affects interstate commerce. The Rices argue that under the proper interpretation of "navigable waters" they have a viable OPA claim since the groundwater under the ranch and the surface waters on the ranch have been impacted by Harken's discharges of oil. The Rices request that we remand this case to the district court for trial.

Although there have been few cases construing the OPA definition of "navigable waters," there is a substantial body of law interpreting that term as used in the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA). The CWA is also limited to "navigable waters," which is defined in both statutes as "waters of the United States." *Compare* 33 U.S.C. § 2701(21) *with* 33 U.S.C. § 1362(7). The House Conference Report on the OPA reads: "The terms 'navigable waters,' 'person,' and 'territorial seas' are re-stated verbatim from section 502 of the [CWA]. ... In each case, these [CWA] definitions shall have the same meaning in this legislation as they do under the [CWA] and shall be interpreted accordingly." House Conference Report No. 101-653, *reprinted in* 1990 U.S.C.C.A.N. 779, 779-80. The Senate Report is similar, and adds that the OPA is intended to cover inland waters as well: "The [OPA] covers all the bodies of water and resources covered by section 311 [of the CWA], including the inland waters of the United States...." Senate Report

No. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 722, 733.

The legislative history of the OPA and the textually identical definitions of "navigable waters" in the OPA and the CWA strongly indicate that Congress generally intended the term "navigable waters" to have the same meaning in both the OPA and the CWA. Accordingly, the existing case law interpreting the CWA is a significant aid in our present task of interpreting the OPA.

The Supreme Court has endorsed an interpretation of "navigable waters" as used in the CWA under which waters and wetlands need not always actually be navigable in fact to be protected under that Act. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 133, 106 S.Ct. 462-63 (1985) (upholding regulations that CWA restricts discharges into non-navigable "wetlands" adjacent to an open body of navigable water).[4] We have adopted a similarly broad interpretation of the language of the CWA. *See Avoyelles*

---

[4]"Wetlands" as used in *Riverside Bayview Homes* referred to those areas described as "wetlands" in the Army Corps of Engineers regulations, 33 C.F.R. § 323.2 (1985). *Riverside Bayview Homes*, 106 S.Ct. at 458. The current Corps regulations, 33 C.F.R. § 328.3(b) (2000), contain essentially the same definition, viz:

"(b) The term *wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas."

There is no evidence nor any claim that any "wetlands" are involved in this case.

*Sportsman's League v. Marsh*, 715 F.2d 897 (5th Cir. 1983). Other courts have also adopted expansive interpretations of "navigable waters" under the CWA. *See, e.g.*, *Quivira Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir. 1985), *cert. denied*, 474 U.S. 1055 (1986)(holding that non-navigable creeks and arroyos are covered by the CWA where intense rainfall could create surface connections with navigable streams); *United States v. Ashland Oil and Transp. Co.*, 504 F.2d 1317, 1329 (6th Cir. 1974) (holding that the CWA prohibited discharges into a non-navigable tributary three waterways removed from a navigable stream).

However, more recently, the Supreme Court has limited the scope of the CWA. In *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 121 S.Ct. 675 (2001), the Court held that an Army Corps of Engineers regulation defining "waters of the United States" to include "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which could affect interstate or foreign commerce" exceeded the scope of the Corps' regulatory power under the CWA as applied to the petitioner's land under a regulation known as the "Migratory Bird Rule." *See id.* at 678 (quoting 33 C.F.R. § 328.3(a)(3)). The "Migratory Bird Rule" states that the CWA covers any intrastate water which could be used by migrating birds that cross state lines

or which could be used to irrigate crops sold in interstate commerce. *See* 51 Fed. Reg. 41217. The case involved several ponds that had formed in pits that were originally part of a sand and gravel mining operation. *Solid Waste Agency*, 121 S. Ct. at 678. The Court refused to interpret the CWA as extending the EPA's regulatory power to the limits of the Commerce Clause, and held that the application of the CWA to the petitioner's land exceeded the authority granted to the Corps under the CWA. *Id*. at 684. The Court distinguished *Riverside Bayview Homes* on the ground that in that case the wetlands in question were adjacent to a body of open water that was actually navigable: "We said in *Riverside Bayview Homes* that the word 'navigable' in the statute was of 'limited effect' and went on to hold that § 404(a) extended to nonnavigable wetlands adjacent to open waters. But it is one thing to give a word a limited meaning and quite another to give it no effect whatever." *Id*. at 682-83. Under *Solid Waste Agency*, it appears that a body of water is subject to regulation under the CWA if the body of water is actually navigable or is adjacent to an open body of navigable water. *See id*. at 680 ("In order to rule for respondents here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the text of the statute will not allow this.")

Nevertheless, under this standard the term "navigable waters" is not limited to oceans and other very large bodies of water. If

the OPA and CWA have identical regulatory scope, the district court's conclusion that the OPA cannot apply to *any* inland waters was erroneous. However, the district court's reluctance to apply an Act targeted at disasters like the Exxon Valdez oil spill to Harken's dry land operations in the Texas Panhandle is certainly understandable. Under any definition of "navigable waters" there still must be a discharge of oil into a protected body of water for liability under either statute to attach.

The Rices point to two categories of waters which, they argue, are protected under the OPA. They claim that Harken has discharged oil into Big Creek and other surface waters on the ranch, and also into the groundwater underneath the ranch. The OPA provides the Rices with a remedy only if they can demonstrate that Harken has discharged oil into any waters that are protected by the OPA. We address groundwater and surface water in turn.

### Groundwater

The Rices urge this Court to apply the CWA definition of "navigable waters" to the OPA. But, even that definition is not so expansive as to include groundwater within the class of waters protected by the CWA. The law in this Circuit is clear that ground waters are not protected waters under the CWA.[5] *Exxon Corp. v. Train*, 554 F.2d 1310, 1322 (5th Cir. 1977). In *Exxon*, we held that

---

[5] The Seventh Circuit has reached a similar conclusion. *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994).

the legislative history of the CWA belied any intent to impose direct federal control over any phase of pollution of subsurface waters. *Id.*[6]

The Rices seek to avoid a similar construction of the OPA by arguing that in enacting the OPA Congress intended to exert its power under the Commerce Clause to the fullest possible degree, and that therefore groundwater, if it affects interstate commerce, should be protected under the Act. But, the Rices do not point to any portion of the Act itself or to any part of the legislative history of the Act to justify their claim that Congress intended to depart from its decision not to regulate groundwater under the CWA. The Rices' theory would extend coverage under the OPA to waters that we have explicitly held are not covered by the CWA. *Exxon*, 554 F.2d at 1322. The Rices have presented us with no reason to construe the term "waters of the United States" more

------

[6] We based our rejection of the EPA's claim that the CWA granted it authority over discharges into deep water wells on clear evidence that congressional intent was to the contrary:

> "...the congressional plan was to leave control over subsurface pollution to the states until further studies, provided for in the Act, determined the extent of the problem and possible methods for dealing with it. In our view, the evidence is so strong that Congress did not mean to substitute federal authority over groundwaters for state authority that the Administrator's construction, although not unreasonable on its face, must give way because 'it is contrary to congressional intentions.'"

*Exxon*, 554 F.2d at 1322 (quoting *EPA v. State Water Res. Control Bd.*, 426 U.S. 200, 227 (1976)).

expansively in the OPA than in the CWA.  We hold that subsurface waters are not "waters of the United States" under the OPA.  Accordingly, the Rices have no cause of action under the OPA for discharges of oil that contaminate the groundwater under Big Creek Ranch.

### Surface Water

The Rices do not confine their claims to groundwater contamination.  They also allege that the Canadian River, Big Creek, and other surface waters on the ranch are directly threatened by Harken's discharges into the groundwater under Big Creek Ranch.  There is substantial evidence of a variety of leaks and minor discharges from Harken's equipment onto the soil surrounding its Big Creek Ranch facilities. It appears from our review of the record that Harken's various discharges were all onto dry land.  There is no evidence in the record of any discharge of oil directly into any body of surface water.  Instead, the Rices appear to claim that Harken's discharges have seeped through the ground into groundwater which has, in turn, contaminated several bodies of surface water.

There is arguably some evidence in the record that some naturally occurring surface waters on Big Creek Ranch have actually been contaminated with oil.  John Drake, the Rices' expert geologist, prepared a preliminary report on water contamination on Big Creek Ranch and was deposed by Harken.  Although the report

-13-

mentions surface waters, Drake's report focuses almost entirely on the impact of Harken's oil production activities on the soil and on the groundwater under Big Creek Ranch. Drake's report does state that several surface water samples were taken in which petroleum hydrocarbons were found.[7] But, the presence of oil does not grant jurisdiction under the Act. Instead, a body of water is protected under the Act only if it is actually navigable or is adjacent to an open body of navigable water.

The bodies of water the Rices seek to protect are consistently referred to in the record as intermittent streams which only infrequently contain running water. There is no detailed or comprehensive description of any of these seasonal creeks available in the record. There is also very little evidence of the nature of Big Creek itself. It is described several times in various depositions as a "seasonal creek" that often has no running water

---

[7] Drake's report states:

"In order to more accurately characterize the site, surface water where present was sampled and analyzed using standard EPA protocol. In all thirteen (13) surface water samples were collected from various surface locations across the site. These samples consisted of four (4) spring, five (5) stock pond, one (1) stormwater, and three (3) stream locations. Several of the surface water samples showed impact by hydrocarbons...."

This statement appears to be consistent with a table, attached to the Rices' motion opposing summary judgment, that summarizes the water samples taken on Big Creek Ranch, although the information provided in that table is somewhat cryptic. It is unclear from the report exactly which samples were taken from naturally occurring surface waters and which were taken from excavated trenches or wells. We are also unsure from the record of the level of impact hydrocarbons have had on the surface waters described in the report.

at all. And, apparently, some of the time that water does flow in it, all the water is underground. There is no detailed information about how often the creek runs, about how much water flows through it when it runs, or about whether the creek ever flows directly (above ground) into the Canadian River. In short, there is nothing in the record that could convince a reasonable trier of fact that either Big Creek or any of the unnamed other intermittent creeks on the ranch are sufficiently linked to an open body of navigable water as to qualify for protection under the OPA. And, as noted, there is no evidence of any oil discharge directly into Big Creek or any other intermittent creek containing above ground water on the ranch; only that there were oil discharges into the ground, some part of which may have, over some undetermined period of time, seeped through the ground into ground water and thence into Big Creek or other intermittent creek (either as an underground or surface body of water).

Although Big Creek and the other intermittent streams located on the ranch do not qualify as "navigable waters," the Rices also allege that the Canadian River is directly threatened by Harken's discharges of oil. The parties agree that the Canadian River is a "navigable water" within the meaning of the OPA. The river is allegedly threatened with contamination by Harken's operations through subsurface flow from the contaminated groundwater under the ranch into the river.

This Court has not yet decided whether discharges into groundwater that migrate into protected surface waters are covered under either the CWA or the OPA. In *Exxon*, we held that the text and legislative history of the CWA "belie[d] an intention to impose direct federal control over any phase of pollution of subsurface waters." *Exxon*, 554 F.2d at 1322. But, in that case the EPA did not argue that the pollutants at issue would migrate from ground water into surface waters and we expressed "no opinion on what the result would be if that were the state of facts." *Id*. at 1312 n. 1. We have therefore not yet addressed whether discharges into groundwater may be actionable under the CWA or OPA if those discharges result in the contamination of some body of protected surface water.

So far as here relevant, the "discharges" for which the OPA imposes liability are those "into or upon the navigable waters." As noted, "navigable waters" do not include groundwater. It would be an unwarranted expansion of the OPA to conclude that a discharge onto dry land, some of which eventually reaches groundwater and some of the latter of which still later may reach navigable waters, all by gradual, natural seepage, is the equivalent of a "discharge" "into or upon the navigable waters."[8]

---

[8] The Seventh Circuit has also concluded that the CWA does not assert authority over ground water simply because those waters may be hydrologically connected to protected surface waters. *Village of Oconomowoc Lake*, 24 F.3d at 965. In *Kelly v. United States*, 618 F. Supp. 1103 (W.D. Mich. 1985), the court held that a CWA claim was not

In *Exxon*, we noted that Congress was aware that there was a connection between ground and surface waters but nonetheless decided to leave groundwater unregulated by the CWA.  *Exxon*, 554 F.2d at 1325.  The issue in *Exxon* was whether the EPA, as an incident to its power under the CWA to issue permits authorizing the discharge of pollutants into protected surface waters,[9] had the authority to place conditions in such permits that regulated the disposal of pollutants into deep wells.  We concluded that EPA did not have that authority, basing that holding on our reading of the statute as well as a detailed examination of the legislative history of the CWA, which we held "demonstrat[ed] conclusively that Congress believed it was not granting the [EPA] any power to

stated by a complaint which alleged "that the pollutants released into the ground at the Air Station not only contaminated the ground water, but are naturally discharging into the Grand Traverse Bay–an undisputed navigable body of water." *Id.* at 1106.  In so holding the court relied on our opinion in *Exxon* as well as its own similar reading of the CWA legislative history.  Expressly addressing footnote 1 of our *Exxon* opinion the court stated (618 F. Supp. at 1106-07):

> "The Fifth Circuit did not concede that discharges into the soil will be subject to the regulatory provisions of CWA if the groundwater contaminated thereby eventually migrates into navigable waters.  On the contrary, it specifically 'express[ed] no opinion on what the result would be [under the CWA] if that were the state of facts.' *Exxon*, 554 F.2d at 1312 n.1.  Moreover, the remainder of the *Exxon* opinion and the unmistakably clear legislative history both demonstrate that Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination. Rather, such authority was to be left to the states."

*Kelly* and *Exxon* are both relied on in this respect by *Village of Oconomuwoc Lake*.  *Village of Oconomuwoc Lake*, 24 F.3d at 965.

[9] *See* 33 U.S.C. § 1344(a).

control disposals into groundwater." *Id.* at 1329.

In light of Congress's decision not to regulate ground waters under the CWA/OPA, we are reluctant to construe the OPA in such a way as to apply to discharges onto land, with seepage into groundwater, that have only an indirect, remote, and attenuated connection with an identifiable body of "navigable waters." We must construe the OPA in such a way as to respect Congress's decision to leave the regulation of groundwater to the States. Accordingly, we hold that a generalized assertion that covered surface waters will eventually be affected by remote, gradual, natural seepage from the contaminated groundwater is insufficient to establish liability under the OPA. In this connection, we also note that such a construction is entirely consistent with the occasion which prompted the Act's passage.

The Rices have offered significant evidence that the groundwater under Big Creek Ranch has been contaminated by oil discharges onto the surface of ranch land. But, the only evidence the Rices have produced of the hydrological connection between this groundwater and the Canadian River is a general assertion by their expert that the Canadian River is down gradient from Big Creek Ranch. Drake's report briefly mentions a hydrological connection between the groundwater and the Canadian River, but there is nothing in the report or in Drake's deposition to indicate the level of threat to, or any actual oil contamination in, the

Canadian River. There is no discussion of flow rates into the river, and no estimate of when or to what extent the contaminants in the groundwater will affect the Canadian River. There is also no evidence of any present or past contamination of the Canadian River. The only evidence in the record that any protected body of water is threatened by Harken's activities is Drake's general assertion that eventually the groundwater under the ranch will enter the Canadian river. The ground water under Big Creek Ranch is, as a matter of law, not protected by the OPA. And, the Rices have failed to produce evidence of a close, direct and proximate link between Harken's discharges of oil and any resulting actual, identifiable oil contamination of a particular body of natural surface water that satisfies the jurisdictional requirements of the OPA. Summary judgment for Harken was appropriate.

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.