**In re James Hamilton NEEDHAM,**
**Janell Renae Cole Needham,**
**Debtors.**

**No. 99–50242.**

United States Bankruptcy Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

July 30, 2001.

D. Patrick Keating, Opelousas, LA, Charles M. Pisano, New Orleans, LA, for debtor.

## REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

James Hamilton Needham and Janell Renae Cole Needham ("Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 8, 1999, and on that day an order for relief was duly entered. The case was subsequently converted to a case chapter 7. The Debtors have received their discharge.

The Debtors filed two separate objections to claims, one titled **OBJECTION TO PROOF OF CLAIM FILED BY THE UNITED STATES ON BEHALF**

OF . THE UNITED STATES COAST GUARD AND REQUEST FOR ESTIMATION OF CLAIM PURSUANT TO 11 USC SECTION 502(C), and the other, OBJECTION TO PROOF OF CLAIM FILED BY GUY E. WALL (D & C OPERATING COMPANY) AND REQUEST FOR ESTIMATION OF CLAIM PURSUANT TO 11 USC 502(C). The court determined that the hearing on the objections to claims should be bifurcated, one dealing with liability and the other, if necessary, dealing with amount.

A hearing on the liability issue was held on November 14, 2000. Following the introduction of evidence, the court ordered the parties to submit post-hearing briefs. All briefs have now been submitted.

The United States filed a proof of claim in this case on behalf of the United States Coast Guard ("USCG"). The claim, in the amount of $254,066.03, is based upon removal costs at an onshore facility, namely an oil well, allegedly owned and/or operated by the Debtors. D & C Operating Company ("D & C") filed a proof of claim asserting a claim of $400,000. The D & C claim is a contingent claim for contribution based upon any liability which D & C may owe to the USCG based upon the same environmental incident.

## FACTUAL BACKGROUND

On or about January 25, 1995, an oil spill occurred near the vicinity of Bayou Cutoff and Bayou Folse in Lafourche Parish, Louisiana. The spill occurred at a facility known as the Thibodeaux well and which was co-owned by Needham Resources, Inc. ("NRI") (10%) and D & C (90%). NRI was the operator of the facility. The Debtor, James Needham, is the 100% owner of NRI. The spill apparently occurred when Tommy Jones, the pumper/gauger employed by NRI, pumped overflowed oil from a containment basin into a drainage ditch. The oil then leaked into nearby Bayou Cutoff. An anonymous complaint was made and the USCG eventually made efforts to clean up the spill.

The USCG argues that the Debtors are liable for the clean-up costs pursuant to 33 U.S.C. § 2701, et seq., familiarly known as the Oil Pollution Act ("OPA"). The Debtors claim that they are not liable under the OPA for several reasons, namely that (1) the Debtor was neither an "owner" nor "operator" of the facility; (2) a third party was responsible for the spill; and (3) the OPA does not apply in this case. The court will address the last issue first as the other issues will be moot in the event the court finds that the OPA does not apply to the spill at issue.

Until recently, the Fifth Circuit had not addressed the scope of the OPA. In *Rice v. Harken Exploration Company*, 250 F.3d 264, 266–267 (5th Cir.2001), in addressing that issue for the first time, the court explained the genesis of the OPA as follows:

The OPA was enacted in 1990 in response to the Exxon Valdez oil spill in Prince William Sound, Alaska, and was intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry. Senate Report No. 101–94, *reprinted in* 1990 U.S.C.C.A.N. 722, 723. The OPA imposes strict liability on parties responsible for the discharge of oil: "[E]ach responsible party for . . . a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident." [Court's footnote omitted.] 33 U.S.C. § 2702(a). The OPA thus con-

cerns facilities which discharge (or pose a substantial threat to discharge) oil "into or upon ... navigable waters," and liability under the OPA is therefore governed by the impact of such a discharge on "navigable waters." The OPA and its related regulations define navigable waters to mean "the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21); 15 C.F.R. § 990.30. The scope of the OPA is an issue of first impression for this Court.

The Debtors take the position that the OPA does not apply inasmuch as no navigable waters were impacted by the discharge. In particular, the Debtors contend that neither the drainage ditch into which the oil was pumped nor Bayou Cutoff are "navigable waters" within the definition section of the OPA. While the jurisprudence interpreting the definition of navigable waters under the OPA is scant, the Fifth Circuit in *Rice* opined that jurisprudence interpreting a similar statute, the Clean Water Act ("CWA"), is instructive:

Although there have been few cases construing the OPA definition of "navigable waters," there is a substantial body of law interpreting that term as used in the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA). The CWA is also limited to "navigable waters," which is defined in both statutes as "waters of the United States." *Compare* 33 U.S.C. § 2701(21) *with* 33 U.S.C. § 1362(7). The House Conference Report on the OPA reads: "The terms 'navigable waters,' 'person,' and 'territorial seas' are re-stated verbatim from section 502 of the [CWA].... In each case, these [CWA] definitions shall have the same meaning in this legislation as they do under the [CWA] and shall be interpreted accordingly." House Conference Report No. 101–653, *reprinted in* 1990 U.S.C.C.A.N. 779, 779–80. The Senate

Report is similar, and adds that the OPA is intended to cover inland waters as well: "The [OPA] covers all the bodies of water and resources covered by section 311 [of the CWA], including the inland waters of the United States ...." Senate Report No. 101–94, *reprinted in* 1990 U.S.C.C.A.N. 722, 733.

The legislative history of the OPA and the textually identical definitions of "navigable waters" in the OPA and the CWA strongly indicate that Congress generally intended the term "navigable waters" to have the same meaning in both the OPA and the CWA. *Accordingly, the existing case law interpreting the CWA is a significant aid in our present task of interpreting the OPA.* (Emphasis added.)

250 F.3d at 267–268.

Further, the court explained that although courts, including the Supreme Court, appeared to have expanded the definition of navigable waters under the CWA to include waters and wetlands which were not actually navigable in fact, a most recent Supreme Court decision limited the scope of the CWA. 250 F.3d at 268. In *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), the Supreme Court held that an Army Corps of Engineers regulation defining "waters of the United States" to include "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which could affect interstate or foreign commerce" exceeded the scope of the Corps' regulatory power under the CWA as applied to the petitioner's land under a regulation known as the "Migratory Bird

Rule." The Court refused to interpret the CWA as extending the Environmental Protection Agency's regulatory power to the limits of the Commerce Clause, and held that the application of the CWA to the petitioner's land exceeded the authority granted to the Corps under the CWA. 121 S.Ct. at 684. The Court distinguished an earlier case, *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), on the grounds that in *Riverside Bayview* the wetlands in question were adjacent to a body of open water that was actually navigable. The Court stated that:

> "We said in *Riverside Bayview Homes* that the word 'navigable' in the statute was of 'limited effect' and went on to hold that § 404(a) extended to nonnavigable wetlands adjacent to open waters. But it is one thing to give a word a limited meaning and quite another to give it no effect whatever."

121 S.Ct. at 682–83.

■ Thus, under the authority of *Solid Waste Agency*, a body of water is subject to regulation under the CWA if and only if the body of water is actually navigable or is adjacent to an open body of navigable water. Utilizing this test in *Rice*, the Fifth Circuit refused to extend and apply the OPA to groundwater or to certain intermittent and seasonal creeks:

> There is no detailed information about how often the creek runs, about how much water flows through it when it runs, or about whether the creek ever flows directly (above ground) into the Canadian River. In short, there is nothing in the record that could convince a reasonable trier of fact that either Big Creek or any of the unnamed other intermittent creeks on the ranch are sufficiently linked to an open body of naviga-

ble water as to qualify for protection under the OPA.

250 F.3d at 270–271.

■ In the instant case, the spill occurred in a drainage ditch and ultimately leaked into Bayou Cutoff. The USCG argues that Bayou Cutoff should be considered navigable water because the flow of Bayou Cutoff is diverted to Bayou Folse by a dam, and Bayou Folse flows into Company Canal, which is tidally influenced. The flow from Company Canal eventually flows into the Gulf of Mexico.

Although the court was not provided with specific information regarding the exact size, volume or flow of Bayou Cutoff, the court did view a video presented by the USCG showing the extent of the oil spill. Having considered the images presented in that video, the court cannot conclude that Bayou Cutoff itself is navigable water. Even the small motor boat used in the video had difficulty in making its way through the bayou at some points and could not even pass one location which was completely blocked by what appeared to be natural foliage. Accordingly, the court does not believe that Bayou Cutoff can be considered navigable water.

While the facility in question in this case is not as removed from any ocean or shoreline as that in *Rice*, the court believes that the facts are similar. The spill in the instant case occurred in a drainage ditch. Although that drainage ditch and Bayou Cutoff may eventually lead to the Gulf of Mexico, the facility itself is some 60 miles from the shoreline. The court believes that the connection between the actual oil spill and navigable waters is too tenuous to find that the OPA applies. As noted by the Fifth Circuit in *Rice*:

> It would be an unwarranted expansion of the OPA to conclude that a discharge onto dry land, some of which eventually reaches groundwater and some of the

latter of which still later may reach navigable waters, all by gradual, natural seepage, is the equivalent of a "discharge" "into or upon the navigable waters." [Court's footnote omitted.]

250 F.3d at 271.

Accordingly, the court concludes that neither the drainage ditch nor Bayou Cutoff are navigable waters as that term is defined in the OPA nor are they sufficiently adjacent to navigable waters to support an extension of the OPA. Thus, the OPA does not apply to the spill in this case. For these reasons, it is unnecessary to address the remaining defenses asserted by the Debtors. The court finds that the Debtors have no liability to the USCG under the OPA as that act does not apply to the facility at issue herein.

For these reasons, the Objection to the Coast Guard Claim is **SUSTAINED**. As the court has found no liability to the USCG, there is no contingent liability to D & C. The Objection to the D & C Claim is therefore **SUSTAINED**. Separate orders in conformity with the foregoing reasons have this day been entered into the record of this proceeding.