United States Court of Appeals
Fifth Circuit

**F I L E D**

December 16, 2003

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-30217

_____

In the Matter of: JAMES HAMILTON NEEDHAM; JANELL RENAE COLE
NEEDHAM

Debtors

UNITED STATES OF AMERICA, ET AL.

Appellants,

versus

JAMES HAMILTON NEEDHAM, ET AL.,

Appellees.

_____

_____

In the Matter of: JAMES HAMILTON NEEDHAM; JANELL RENAE COLE
NEEDHAM

Debtors
D & C OPERATING INC.

Appellants,

versus

JAMES HAMILTON NEEDHAM; JANELL RENAE COLE NEEDHAM

Appellees.

Appeals from the United States District Court
for the Western District of Louisiana,
Lafayette-Opelousas Division

_____

Before REAVLEY, JOLLY, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case arises from the efforts of the United States Coast Guard to compel James and Janell Needham ("Needhams") to reimburse the United States, under the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701-2720 (2000), for cleanup costs associated with an oil spill. The bankruptcy court, in the first instance, and the district court on appeal, held that the Needhams were not liable to the United States for the cleanup costs because the waters in question were not navigable, and were therefore beyond the reach of the OPA. However, for the reasons stated below, we disagree and therefore reverse and remand.

## I. BACKGROUND

On or about January 25, 1999, the Louisiana Department of Environment Quality ("LDEQ") received a complaint of an oil spill in LaFourche Parish, Louisiana. The spill occurred at a facility known as the Thibodeaux Well when Tommy Jones, a pumper/gauger employed by Needham Resources, Inc. ("NRI"), pumped oil from a containment basin into an adjacent drainage ditch. The well is co-owned by NRI and D&C Operating, Inc. ("D&C").[1] James Needham ("Needham") is the sole owner of NRI.

The EPA investigated the spill and contacted James Needham to discuss the matter. Initially, NRI hired a private contractor to perform the necessary cleanup, but lacked the

---

[1] D&C owns 90% of the well and NRI, the well operator, owns the remaining 10%.

2

resources to complete the operation. The EPA and the Coast Guard then assumed responsibility for the cleanup effort funded by the Oil Spill Liability Act. Their efforts cost roughly $207,000.[2]

On February 8, 1998, the Needhams filed a Chapter 11 bankruptcy petition in the Western District of Louisiana.[3] The next day, the United States sued the Needhams, NRI and D&C in federal court to recover its cleanup costs. The civil suit was and remains stayed pending resolution of this bankruptcy court dispute over the government's proof of claim against the Needhams. D&C also filed a proof of claim, contingent upon a finding of liability under the OPA. The Needhams objected to the EPA's proof of claim, asserting, inter alia, that the spill did not implicate any navigable waters subject to federal jurisdiction, and was therefore not regulated by the OPA.

At the bankruptcy court hearing on the disputed claim, the United States offered a videotape showing the extent of the oil spill. Patrick Breaux, an environmental coordinator with the LDEQ, narrated the video and offered further testimony concerning the nature and extent of the cleanup. Breaux was the hearing's only live witness. Moreover, within a litany of documentary evidence, the parties submitted a five-page written stipulation addressing a

---

[2]    The Oil Spill Liability Trust Fund is directly available to the EPA and the Coast Guard to fund federal removal costs. See 33 U.S.C. §§ 2712(a); 1321(s)(2000). Moreover, the Fund is available to pay uncompensated removal costs to third parties. See 33 U.S.C. § 1012(a)(4)(2000).

[3]    The Needhams' bankruptcy petition was later converted to Chapter 7.

variety of evidentiary and substantive issues. Importantly, the parties there agreed that the oil, which was originally discharged into the drainage ditch at Thibodeaux Well, spilled into Bayou Cutoff, and then into Bayou Folse. Bayou Folse flows directly into the Company Canal, an industrial waterway that eventually flows into the Gulf of Mexico.

After reviewing the evidence, the bankruptcy court found that "neither the drainage ditch nor Bayou Cutoff are navigable waters nor are they sufficiently adjacent to the navigable waters to support an extension of the OPA." In re Needham, 279 B.R. 515, 519 (Bankr. W.D. La. 2001). Thus concluding that the spill was not subject to federal regulation, the bankruptcy court sustained the Needhams' objection to the United States' proof of claim. The United States appealed the decision to the district court, which briefly affirmed, finding no basis to disturb the bankruptcy court's conclusions. See United States v. Needham, 2002 WL 1162790 (W.D. La. January 22, 2002).

## II. STANDARD OF REVIEW

We review the factual findings of the trial court for clear error. In re Gerhardt, 348 F.3d 89, 91 (5th Cir. 2003). Therefore, whether a waterway is navigable-in-fact is subject to the clearly erroneous standard. See Dardar v. LaFourche Realty Co., Inc., 55 F.3d 1082, 1085 (5th Cir. 1995)(citing The Daniel

4

<u>Ball</u>, 77 U.S. (10 Wall.) 557, 563 (1870)).[4]  "Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made."  <u>Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.</u>, 346 F.3d 530, 534 (5th Cir. 2003) (citations and quotations omitted).  Conversely, the district court's statutory interpretation is subject to de novo review.  <u>United States v. Phillips</u>, 319 F.3d 177, 183 (5th Cir. 2003).

## III. DISCUSSION

The United States challenges the bankruptcy court's conclusion that the oil discharged from the Needham facility did not contaminate waters regulated by the federal government under the OPA.  It contends that the oil spilled into navigable-in-fact waters, or at a minimum, into waters adjacent to an open body of navigable water.  Because we agree with the latter argument, we reverse the bankruptcy court's decision.

### A.

---

[4]    This court's decision in <u>Dardar</u> appears to be in tension with the Supreme Court's decision in <u>United States v. Appalachian Elec. Power Co.</u>, 311 U.S. 377, 403-404, 61 S.Ct. 291, 297-98 (1940), which suggests a mixed question of law and fact standard.  The Court stated that "[i]n cases involving the navigability of water courses, this Court, without expressly passing on the finality of the findings, on some occasions has entered into consideration of the facts . . . to determine for itself whether the courts have correctly applied to the facts found the proper legal tests."  <u>Id</u>.  In the Court's view, "[b]oth the standards and the ultimate conclusion involve questions of law inseparable from the particular facts to which they are applied."  <u>Id</u>. at 404.  Nonetheless, as will be made clear below, the result in this matter is unchanged regardless of the standard of review employed.

The OPA imposes strict liability upon parties that discharge oil into "navigable waters," a term defined in the statute to mean "the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21)(2000).[5] This is co-extensive with the definition found in the Clean Water Act ("CWA"). See Rice v. Harken Exploration Co., 250 F.3d 264, 267 (5th Cir. 2001) (citing 33 U.S.C. § 1362(7)(2000)).[6] Rice establishes that the OPA, like the CWA, does not extend federal regulation to the outermost limits of the Commerce Clause. Id. at 269-70.

Although under both the OPA and the CWA "waters and wetlands need not always actually be navigable-in-fact to be protected," id. at 268, the Supreme Court recently found the inclusion within "waters of the United States" of certain isolated, non-navigable waters exceeded the Army Corps of Engineers' regulatory power under the CWA. Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers ("SWANCC"), 531 U.S. 159, 172-74, 121 S.Ct. 675, 682-84 (2001). The Court emphasized that these isolated bodies of water were neither navigable-in-fact nor adjacent to open water. Id. at 168.

---

[5]    Under the OPA, "each responsible party for a vessel or facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a)(2000).

[6]    Rice was the first case in this circuit to examine the contours of the OPA, and offers a persuasive analysis of its text and legislative history. 250 F.3d at 267-68.

SWANCC narrowed, but did not overturn <u>United States v.</u> <u>Riverside Bayview Homes</u>, 484 U.S. 121, 106 S.Ct. 455 (1985), which upheld CWA regulations restricting discharges into a non-navigable wetland adjacent to open waters.  <u>Id</u>. at 133.[7]  To reach this result, <u>Riverside Bayview Homes</u> interpreted "waters of the United States" broadly to encompass "all wetlands adjacent to other bodies of water over which the Corps has jurisdiction . . . ."  Thus, <u>Riverside Bayview Homes</u>, unlike <u>SWANCC</u>, involved a wetland "adjacent to an open body of water that was actually navigable." <u>Rice</u>, 250 F.3d at 268; <u>see also</u> <u>SWANCC</u>, 531 U.S. at 167 (stating that the wetland in <u>Riverside Bayview Homes</u> "actually abutted on a navigable waterway").

Nevertheless, the United States urges this court to approve its regulatory definition of "navigable waters."  <u>See</u> 40 C.F.R. § 300.5 (2003).  This definition includes as "navigable waters" all "tributaries" of navigable-in-fact waters. <u>See</u> <u>id</u>. at § 300.5(d). According to the government, the definition covers all waters, excluding groundwater, that have any hydrological connection with "navigable water."  At least two courts appear to have agreed with this expansive interpretation.  <u>See</u> <u>United States v.</u> <u>Deaton</u>, 332 F.3d 698, 702 (4th Cir. 2003)(asserting authority,

---

[7]     As the Court stated in <u>SWANCC</u>: "We said in <u>Riverside Bayview Homes</u> that the word 'navigable' in the statute was of 'limited effect' and went on to hold that § 404(a) extended to non[-]navigable wetlands adjacent to open waters. But it is one thing to give a word limited meaning and quite another to give it no effect whatsoever."  531 U.S. at 682-83 (citation omitted).

7

under the CWA, over wetlands that are "adjacent to, and drain into, a roadside ditch whose waters eventually flow into the navigable Wicomico River and Chesapeake Bay"); United States v. Rapanos, 339 F.3d 447, 449 (6th Cir. 2003) (asserting authority, under the CWA, over wetlands that flow into a man-made drain, which in turn flows into a creek, which in turn flows into a navigable river).

In our view, this definition is unsustainable under SWANCC. The CWA and the OPA are not so broad as to permit the federal government to impose regulations over "tributaries" that are neither themselves navigable nor truly adjacent to navigable waters. See Rice, 250 F.3d at 269.[8] Consequently, in this circuit the United States may not simply impose regulations over puddles, sewers, roadside ditches and the like; under SWANCC "a body of water is subject to regulation . . . if the body of water is actually navigable or adjacent to an open body of navigable water." Rice, 250 F.3d at 269.[9]

**B.**

---

[8] In short, the regulatory definition, if applied in this fashion, would push the OPA to the outer limits of the Commerce Clause and raise serious constitutional questions. As noted above, Rice and SWANCC have rejected such an expansive reading of the OPA and CWA respectively. Accordingly, the regulation is not entitled to Chevron deference. SWANCC, 531 U.S. at 172-73 ("Thus, where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988)).

[9] In the end, there must be "a close, direct and proximate link between . . . [the] . . . discharges of oil and any resulting actual, identifiable oil contamination of natural surface water that satisfies the jurisdictional requirements of the OPA." Rice, 250 F.3d at 272.

8

Using this interpretation of the OPA, we next consider the bankruptcy court's findings of fact. Two finding of fact are critical. First, the court found that the oil spilled only into the drainage ditch adjacent to the Thibodeaux Well and Bayou Cutoff. See In re Needham, 279 B.R. at 516-18. The court ruled that neither the drainage ditch nor Bayou Cutoff were navigable-in-fact. Id. at 518. Second, the court found that the Gulf of Mexico was the only open body of navigable water in the vicinity of the spill. Id. at 518. These findings constitute clear error.

Specifically, it was clear error to disregard the effects of the spill on Bayou Folse and the Company Canal. The parties' stipulation of facts contained the following language: "On or before January 25, 1995, oil was discharged from the Thibodeaux facility into Bayou Cutoff and Bayou Folse near Thibodeaux, LaFourche Parish, Louisiana." (emphasis added). "Under federal law, stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them, unless manifest injustice would result therefrom or the evidence contrary to the stipulation was substantial." Quest Medical, Inc. v. Apprill, 90 F.3d 1080, 1087 (5th Cir. 1996)(citations omitted).

There is no basis to disregard the stipulation, and indeed none has been argued. Not only is the stipulation consistent with the evidence adduced at the hearing, but in his opening statement, counsel for the Needhams acknowledged that the

9

residue from the spill was found 10 to 12 miles from the oil well, i.e., in Bayou Folse.[10]

As a result of the stipulation, the court should not have limited its application of the OPA to the spill's impact on Bayou Cutoff. Under Rice, and in light of the stipulation, the proper inquiry is whether Bayou Folse, the site of the farthest traverse of the spill, is navigable-in-fact or adjacent to an open body of navigable water. See Rice, 250 F.3d at 269. Either basis is sufficient to trigger the OPA.

We conclude, because it is undisputed, that Bayou Folse is adjacent to an open body of navigable water, namely the Company Canal.[11] "[T]he term 'navigable waters' is not limited to oceans and other very large bodies of water." Rice, 250 F.3d at 269. Rather, inland waterways may also fall within the definition of navigable waters. See id. Inland waterways, such as the Company Canal, are navigable-in-fact "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted . . . ." Daniel Ball, 77 U.S. at 563; see also Appalachian Elec.

---

[10]    Additionally, Patrick Breaux testified that the oil was visible in the water "near a point where Highway 90 intersects Bayou Folse."

[11]    Whether Bayou Folse is navigable-in-fact is a close question, and one we need not resolve here. Bayou Folse's adjacency to the Company Canal is sufficient to resolve this matter. Moreover, it is unwise for a court to overreach and resolve issues unnecessarily, particularly when, as is the case here, the issue involves navigable waters. See Appalachian Elec. Power Co., 311 U.S. at 408 (concluding that "[w]hen once found to be navigable, a waterway remains so").

<u>Power Co.</u>, 311 U.S. at 409 (a waterway is navigable if it can be made useful through reasonable improvements); <u>Economy Light & Power Co. v. United States</u>, 256 U.S. 113, 122, 41 S.Ct. 409, 412 (1921) (the use of navigable waters may be limited to travel during seasonal water level fluctuations); <u>but</u> <u>see</u> <u>United States v. Oregon</u>, 295 U.S. 1, 23, 55 S.Ct. 610, 619 (1935)(waterway is not navigable where commercial use or susceptibility of use is "sporadic and ineffective").

The Company Canal falls within the definition of navigable waters. At the bankruptcy court hearing, Breaux testified that "[t]he Company Canal is an industrial corridor between the Intracoastal Waterway and Bayou LaFourche." He also observed that the Company Canal contains "shipyards, repair facilities, dry docks, [and a] gas freeing operation." An inland waterway, such as the Company Canal, that supports commerce, is unobstructed, and is traversed on a consistent basis is navigable-in-fact.

Thus, the only remaining question is whether Bayou Folse is adjacent to the Company Canal. Under <u>Rice</u>, the term "adjacent" cannot include every possible source of water that eventually flows into a navigable-in-fact waterway.[12] Rather, adjacency necessarily

---

[12]    Neither the CWA nor the OPA define the term "adjacent." The Army Corps of Engineers defines "adjacent" to mean "bordering, contiguous, or neighboring." 33 C.F.R. § 328.3. However, this regulation was invalidated, at least in part, in <u>SWANCC</u>. Nevertheless, the Corps' definition comports with the term's plain meaning. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 26 (1986) offers several definitions:  "(a) not distant or far off: nearby but not touching;

11

implicates a "significant nexus" between the water in question and the navigable-in-fact waterway. See SWANCC, 531 U.S. at 167 (finding that Riverside Bayview Homes turned on the "significant nexus" between the wetlands and the "navigable waters"); see also Rice, 250 F.3d at 271 (requiring that the adjacent body of water be "sufficiently linked" to the navigable-in-fact water). Under this standard, Breaux's testimony and the stipulation prove that Bayou Folse is plainly adjacent to the Company Canal — Bayou Folse flows directly into the canal. On this basis, the Thibodeaux Well oil spill implicated navigable waters and triggered federal regulatory jurisdiction pursuant to the OPA.

## IV. CONCLUSION

Under Rice, the OPA permits the recovery of cleanup costs in only two instances: (1) if oil spills into navigable-in-fact waters or (2) if oil spills into non-navigable waters (or wetlands) that are truly adjacent to an open body of navigable water. Here, the parties stipulated that oil spilled into Bayou Folse. Bayou Folse is adjacent to the Company Canal, which is an open body of navigable water. We therefore conclude that the OPA applies to the

---

(b) relatively near and having nothing of the same kind intervening: having a common border: abutting, touching: living nearby or sitting or standing relatively near or close together; and (c) immediately preceding or following with nothing of the same kind intervening." Hence, both the regulatory and plain meaning of "adjacent" mandate a significant measure of proximity. Therefore, including all "tributaries" as "navigable waters" would negate Rice's adjacency requirement, and extend the OPA beyond the limits set forth in SWANCC.

spill at issue.  Consequently, we **REVERSE** and **REMAND** this matter

for consideration of the Needhams' remaining defenses.[13]

---

[13] On appeal, the parties submitted supplemental briefs addressing the remaining questions under the OPA: (1) whether James Needham was an owner or operator of the facility and (2) whether Needham could establish a third party affirmative defense.  <u>See</u> 33 U.S.C. § 2701(32)(2000); 33 U.S.C. § 2702(a)(2000); 33 U.S.C. § 2703(a)(2000).  However, we conclude, in our discretion, that the bankruptcy court should address these fact-laden issues in the first instance.  <u>See</u> <u>Louisiana World Exposition v. Federal Ins. Co.</u>, 858 F.2d 233, 254 (5th Cir. 1988).