FORRESTER, District Judge,
concurring in part and dissenting in part:
I respectfully dissent from the portion of the majority opinion’s discussion of Plaintiffs’ Clean Water Act claims. There is no Clean Water Act violation for the discharge onto Plaintiffs’ soil and they allege no kind of standing — including economic standing — to complain of the discharge into the nearby stream.
At trial, Plaintiffs demonstrated contamination of the soil on their land caused by storm-water, sediment, and polluted run *1020 off from Defendants’ property.[1] Plaintiffs complained that this contamination diminished the value of their property. Plaintiffs, however, do not have a cause of action under the Clean Water Act because the Act applies only to “navigable waters.”
Title 33 U.S.C. § 1311(a) generally prohibits “the discharge of any pollutant by any person” absent compliance with one of the permit systems established in the statute. Under the Act “discharge of pollutant” is defined as “any addition of any pollutant to navigable waters from any point source.” See 33 U.S.C. § 1362(12)(A). “Navigable waters” are defined in the statute as “the waters of the United States, including the territorial seas.” 33 U.S.C. § 1362(7). Regulations issued by the Environmental Protection Agency further define “navigable waters” as including “waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which could affect interstate or foreign commerce.” See, e.g., 40 C.F.R. § 122.2 (internal quotes omitted); 40 C.F.R. § 230.3(s)(3).
Thus, elements of the statute and regulations read together demonstrate that in order to establish a claim under the Clean Water Act, a plaintiff must establish that pollutants have been discharged into navigable waters. This is uniformly cited as an element of such a claim.[2]
Indeed, the Clean Water Act does not provide a cause of action for pollution of all waters of the United States. For example, in Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (“SWANCC’), the Court found that isolated ponds on a proposed municipal solid waste disposal site could not be considered “navigable waters” under the Clean Water Act because they had no “significant nexus” with navigable waters. Id. at 167, 121 S.Ct. 675; see also In re Needham, 354 F.3d 340, 345-46 (5th Cir.2003) (“the United States may not simply impose regulations over puddles, sewers, roadside ditches, and the like”; rather, a body of water is subject to regulation only if “actually navigable or directly adjacent to an open body of navigable water”).
Whether one says there must be a “significant nexus” or some “hydrological connection” to a water of the United States,[3] *1021 Plaintiffs have shown no connection at all between the soil on their property and a navigable water of the United States. As such, they have no cause of action under the Clean Water Act.
There is evidence of a “navigable water” in the case — -a small stream running on Defendants’ property that eventually flows into the Yellow River. Plaintiffs presented evidence that Defendants dumped sediment, dirt and other pollutants into the stream. Plaintiffs, however, have neither pled nor proven anything that would give them standing to assert a claim with respect to this stream.[4] Plaintiffs are not riparian owners of the stream. Their alleged economic damage relates to the soil contamination on their dry land and noise coming from the operation of Defendants’ business.[5] Plaintiffs have not connected the diminution in their property to anything that happened in the nearby stream. Further, Plaintiffs have raised no recreational or aesthetic concerns for the stream.
Therefore, I would hold that Plaintiffs have no cause of action under the Clean Water Act with respect to contamination of their soil and that they have no standing to assert any claims for pollution of the stream running behind Defendants’ property. Because I conclude that Plaintiffs cannot bring a claim under the Clean Water Act, I would vacate the district court’s award of $18,360 in civil penalties under *1022 the Act. See Order, August 8, 2003, at 47. Similarly, I would also vacate the injunc-tive relief ordered by the district court under the Clean Water Act. See id., at 47-51.
In all other respects, I concur in the majority’s opinion.

.See Trial Transcript, at 81 (Quebell Parker testifying that storm water runoff from the SMP facility would flood her property); at 134, 139, 148, 151-52, 154 (Charles Parker testifying that water, debris, and particles would flow from SMP facility to Parker property); at 309-12 (Plaintiffs’ expert Charles MacPherson testifying that he found light material such as automobile fluff, taillight lenses, transformer insulation material, and battery casings on Parker property on other side of silt fence); at 315, 318 (MacPherson testifying that two of five soil samples taken on Parker property showed elevated levels of PCBs and lead). Plaintiffs also alleged that Defendants' lack of compliance with the permitting provisions of the Clean Water Act contributed to this contamination.

. See generally United States v. Allegheny Ludlum Corp., 366 F.3d 164, 171-72 (3d Cir. 2004); Greenfield Mills, Inc. v. Macklin, 361 F.3d 934, 946-47 (7th Cir.2004); Hughey v. JMS Development Corp., 78 F.3d 1523, 1530 (llth Cir. 1996); Committee to Save Mokelumne River v. East Bay Mun. Utility Dist., 13 F.3d 305, 308 (9th Cir. 1993); National Wildlife Federation v. Gorsuch, 693 F.2d 156, 165 (D.C.Cir.1982).

. Compare United States v. Rapanos, 339 F.3d 447, 453 (6th Cir.2003) (interpreting SWANCC narrowly to require only a "hydrological connection”), and United States v. Deaton, 332 F.3d 698, 702 (4th Cir.2003) (same), with In re Needham, 354 F.3d 340, 345-47 (5th Cir.2003) (adopting more expansive reading of SWANCC and requiring a stricter "sig *1021 nificant nexus” in order to meet the definition of "navigable water”).

. To establish Article III standing in a case brought pursuant to the Clean Water Act, a plaintiff must show (1) injury in fact, (2) traceability, and (3) redressability. See generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury in fact must be an "invasion of a legally protected interest that is 'concrete and particularized.' ” See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 156 (4th Cir.2000) (en banc). The injury must affect the plaintiff in a personal and individual way. Id. (finding standing for plaintiff who owned lake in path of defendant's toxic chemical discharge and testified his family swam and fished less in the lake and his property value declined).
A plaintiff may show an aesthetic, recreational, or economic injury. See Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 181-83, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (noting that plaintiffs drove over river, fished, camped, swam, and picnicked in and near river and one member of plaintiff's organization testified that her home was located near defendant’s facility and she believed her property value was diminished because of the pollutant discharges from the facility); American Canoe Ass’n v. Murphy Farms, Inc., 326 F.3d 505, 518-19 (4th Cir.2003) (considering economic impact of pollutant discharges on a plaintiff’s river guide business); Natural Resources Defense Council v. Southwest Marine, Inc., 236 F.3d 985, 994 (9th Cir.2000) (plaintiffs testified about aesthetic and recreational use of water); Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 556 (5th Cir.1996) (same); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72-73 (3d Cir.1990) (same).

. At trial, Plaintiff Charles Parker testified that "if we take away the facility next door ... for residential [the property] should appraise in around the 90,000 range. And for commercial, it should be up around about 130.” Trial Transcript, at 167. Mr. Parker was also asked whether he had any opinion on the "diminution in the value, if any, in the property because of the facility.” Id. He responded "for residential ... the value is greatly depressed because of the nuisance factor next door, the noise. For commercial, it is not marketable.” Id. Charles MacPher-son, the environmental consultant who testified for the Parkers at trial, stated that he believed it would cost between $300,000 and $400,000 to investigate and remediate both the Parkers’ and Defendants’ property. Trial Transcript, at 336-37. The substantial portion of remediation would involve investigation and monitoring the property for contamination. Id. Removing any contaminated soil from the Parker property could cost between $25,000 and $45,000. Id. at 338.