**UNITED STATES of America,
Plaintiff,**

v.

**RGM CORPORATION,
et al., Defendants.**

**No. Civ.A. 2:01CV719.**

United States District Court,
E.D. Virginia,
Norfolk Division.

July 26, 2002.

Craig Paul Wittman, Office of the United States Attorney, Norfolk, VA, Steven Edward Rusak, Kent Edmund Hanson, Kenneth C. Amaditz, U.S. Department of Justice, Environmental Div., Washington, DC, for Plaintiff.

Mark Randolf Baumgartner, Pender & Coward, Virginia Beach, VA, Hunter Wilmer Sims, Jr., Kaufman & Canoles, Norfolk, VA, for Defendants.

*OPINION AND ORDER*

MORGAN, District Judge.

The parties in this matter come before the Court for a non-jury trial seeking to resolve Clean Water Act ("CWA") jurisdictional issues surrounding a 658 acre tract of land in Chesapeake, Virginia, known as the Edinburgh Planned Unit Development (the "property,").[1] At the conclusion of the four day non-jury trial, the Court ruled from the bench that the property was not within the United States Army Corps of Engineers (the "Corps") jurisdiction under the Clean Water Act, 33 U.S.C. § 1251, *et seq* (the "CWA"). This opinion and order further explains the reasoning of the Court's May 7, 2002 ruling.

FACTUAL AND PROCEDURAL BACKGROUND

Defendants RGM Corporation, RGM Land Trust, and Wilson Corp (collectively referred to as "RGM") are the principle owners of several parcels of contiguous land in the Pleasant Grove Borough of Chesapeake, Virginia. They have combined their land to create a proposed 658.

---

**1.** The property is located to the west of the Route 168 Bypass and south of Peaceful Road, in the Pleasant Grove Borough of the City of Chesapeake, Virginia.

acre development that will consist of an upscale residential neighborhood with an adjacent golf course. It will be located west of the Route 168 Bypass and south of Peaceful Road. Surface water drains from the property to the south via the Saint Brides drainage ditch toward the Northwest River, a navigable waterway. To the north, water flows from the property to the north via a system of man-made ditches that feed into Cooper's Ditch, which flow into the Intracoastal Waterway, a navigable waterway.[2]

On August 2, 2001, the Corps issued a cease and desist order to RGM[3] in reaction to dredging and filling that were taking place on the property. The Corps believed this activity by the Defendants to be in violation of the CWA section 404(a) ("Section 404(a)"), 33 U.S.C. § 1344(a), and CWA section 301(a) ("Section 301(a)"), 33 U.S.C. § 1311(a), because they observed lands which they believed to be wetlands hydrologically connected to the Northwest River to the south and to the Intracoastal Waterway to the north being disturbed without a permit. Further cease and desist orders were delivered to RGM on August 29, 2001, regarding what the Corps believed to be unauthorized filling of wetlands on August 22 and 28, 2001. Again on September 7, 2001, the Corps observed

what they characterize as unauthorized filling. RGM did not believe that its work violated the CWA, so they continued on schedule.[4]

The Corps instituted this action on September 21, 2001, seeking to enforce its claims to Section 404 jurisdiction. Simultaneous with the filing of this civil action, the Corps moved for a Temporary Restraining Order ("TRO") to immediately stop all work, while the Court decided whether it would grant the Corps' request for a Preliminary Injunction (PI). On September 27, 2001, the Court held an evidentiary hearing, and granted the United States a TRO lasting six days.[5] At the conclusion of that six day period, the Court held a second hearing on October 3, 2001 and extended the TRO through October 12, 2001, requesting the parties to supply more detailed information about the character and topography of the property, as well as the percentage of the land the parties were contending constituted wetlands.

The parties provided the further information requested by the Court on the property during a third hearing on October 12, 2001. After reviewing the information provided by the parties and the record, the Court applied the four part *Blackwelder* test[6] and denied the Corps'

---

**2.** All parties stipulate to the fact that the wetlands upon the property do not extend continuously to the Intracoastal Waterway.

**3.** While it is undisputed that the Corps issued a Cease and Desist order to RGM, there was apparently never a written cease and desist order formally issued to Defendants Vico Construction Corporation or Paxton Contractors Corporation. There was testimony that a representative of the Corps verbally spoke with Jeffery A. Paxton, the president of Paxton Contr. Corp., about the government's concern that illegal filling and dredging activities were taking place on the property.

**4.** Cease and desist orders are not self-executing, and the penalties for violating either the Act or a compliance order are the same.

**5.** In that TRO, the Court ordered that RGM cease and desist filling in any wetlands areas or excavating in any wetlands areas or engaging in any activity that would lead to the channeling of surface water off the property for a period of six (6) days, commencing September 27, 2001.

**6.** In deciding whether to grant a preliminary injunction, the Court must consider the four factors enumerated in *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 193 (4th Cir.1977):(1) the likelihood of irreparable

request that the Court enter a PI, finding that the Plaintiff had not carried its burden of proof.

RGM has continued its work on the property, but all parties stipulated to the fact that the wetlands impacted could be restored if the Court later ruled that the Corps had jurisdiction. Final Pre–Trial Order at 2.

## CWA REGULATIONS AS PROMULGATED BY THE CORPS

The Corps first promulgated regulations for the CWA on April 3, 1974 (the "1974 regulations"). Subsequently, it enacted major revisions in 1975, 1977, and 1986 (the "1986 regulations"), and significant revisions almost biannually. While the scope of the Corp's regulations has grown steadily over the past few decades, the authority vested in the Corps by Congress has not been expanded since the Corps promulgated its first set of regulations.

Both the 1974 and 1986 regulations share the definition for navigable waters: "The term 'navigable waters of the United States' and 'navigable waters,' as used herein mean those waters of the United States which are subject to the ebb and flow of the tide and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 C.F.R. 209.120(d)(1) (1974), 33 C.F.R. 321.2(a) (1986). Both sets of regulations include the same conditions that must be met to be considered a navigable water:

(1) Past, present, or potential presence of interstate or foreign commerce;

(2) Physical capabilities for use by commerce as in paragraph (a) of this section; and

(3) Defined geographic limits of the waterbody. 33 C.F.R. 209.260(b) (1974), 33 C.F.R. 329.5 (1986).

The 1986 regulations distinguish the applicability of the term "navigable waters" from the term "waters of the United States." The 1986 regulations state:

The terms 'navigable waters of the United States' and 'waters of the United States' are used frequently throughout these regulations, and it is important from the outset that the reader understand the difference between the two. 'Navigable waters of the United States' are defined in 33 C.F.R. Part 329. These are waters that are navigable in the traditional sense where permits are required for certain work or structures pursuant to Section 9 and 10 of the Rivers and Harbors Act of 1899. 'Waters of the United States' are defined in 33 C.F.R. Part 328. These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to Section 404 of the Clean Water Act. 33 C.F.R. § 320.1(d) (1986).

The 1974 regulations make no such distinction.

The 1986 regulations state that the definition for "waters of the United States" applies to the authority of the Corps under the CWA. 33 C.F.R. § 328.1 (1986). It also clearly states that the definition for "navigable waters" "does not apply to authorities under the Clean Water Act ..." 33 C.F.R. § 329.1(1986). Again, there is no such distinction in the 1974 regulations.

The 1986 regulations define the term "waters of the United States," which it states defines CWA jurisdictional limits, 33

harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.

C.F.R. § 328.1 (1986), in much broader terms than the definition for "navigable waters:"

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;

(i.) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii.) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii.) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (1)-(6) of this section. 33 C.F.R. 328.3 (1986).

The 1974 regulations state under "General Policies" that, "[t]he term navigable waters of the United States' is used to define the scope and extent of the regulatory powers of the Federal government." 33 C.F.R. § 209.260(b) (1974). The 1986 regulations do not contain this statement.

In several places throughout the regulations, the 1986 regulations have substituted the term "waters of the United States," where the 1974 regulations had used "navigable waters." These changes took place in otherwise identical sections of the 1986 and 1974 regulations. *See e.g.* 33 C.F.R. 209.120(b)(7) (1974) and 33 C.F.R. § 209.120(b)(7) (1986); 33 C.F.R. § 209.120(c) (1974) and 33 C.F.R. § 209.120(c) (1986); 33 C.F.R. § 209.120(d)(3) (1974) and 33 C.F.R. § 323.2(c) (1986); 33 C.F.R. § 209.120(e)(2) (1974) and 33 C.F.R. § 323.3(a) (1986).

The 1975 regulations' definition of "Navigable waters" includes, "All tributaries of navigable waters of the United States up to their headwaters and landward to their ordinary high water mark." 33 C.F.R. 209.120(2)(i)(e) (1975). The 1975 regulations further define "Primary tributaries" as "the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters and does not include any additional tributaries extending off of the main stems of these tributaries." 33 C.F.R. § 209.120(d)(2)(ii)(e). The 1986 regulations do not have a definition of Primary tributaries, nor do they exclude "additional tributaries extending off of the main stems of these tributaries." Primary tributaries are left to be defined by the Corps on a case-by-case basis under the 1986 regulations.

The 1975 preamble to the regulations states, "With respect to the inland areas of the country, Corps jurisdiction under Section 404 of the FWPCA would extend to all rivers, lakes, and streams that are navigable waters of the United States, to all tributaries (primary, secondary, tertiary, etc.) of navigable waters of the United States, and to all interstate waters." 40 Fed.Reg. 31,320–21 (1975).

CORPS JURISDICTION OVER THE PROPERTY

Congress passed the CWA in reaction to heavily polluted waters around the country, typified by the 1969 fire that burned on Ohio's Cuyahoga River, which flows through Cleveland. *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 175, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (Stevens, J. dissenting) (*"SWANCC"*). The lofty goal of the CWA was "ending water pollution by 1985." *Id.* Since the time of the passage of the CWA, the Corps' expansion of the scope and depth of its CWA regulations continued virtually unchecked by the Courts until *SWANCC*.[7]

The Corps possesses an impressive cadre of knowledgeable and dedicated environmental scientists who are able to present an appealing case for the exercise of jurisdiction over wetlands of the nature which are at issue here. However, since the passage of the CWA in 1974, the Corps' numerous revisions of its own regulations have expanded its jurisdiction to areas not contemplated by either the CWA or its own initial regulations interpreting this legislation. There is no doubt that environmental scientists have learned much about wetlands and their impact upon the environment during the 28 years since the CWA was enacted. Significantly, while there has been no legislation expanding Corps jurisdiction in this area since 1974, the Corps has filled this gap by expanding its own jurisdiction through the revision of its regulations, as well as through the expansive interpretation of its own regulations.

Granted it is more efficient to keep pace with emerging scientific knowledge by means of amending executive agency regulations than through the more cumbersome legislative process. However, in the legislative process Congress is well equipped to balance the rights of land owners with environmental concerns. The History of CWA regulations suggests that the rights of land owners have been repeatedly invaded by the Corps through bureaucratic fiat.

Property rights as well as what we call human and civil rights are protected by the Constitution. *See, e.g.,* U.S. Const. Amend. V, XIV. For the better part of the last century, both courts and Congress have acted to protect human and civil rights. With a few notable exceptions, *see SWANCC, supra; Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); and *United States v. Wilson*, 133 F.3d 251 (4th Cir.1997), neither the Courts nor Congress have acted to protect the constitutional rights of private landowners. Indeed, recent decades have seen increasingly rigid, often stifling, regulation of these rights at the federal, state and local level. Regardless of the degree of importance assigned to human and civil rights vis-a-vis property rights, it cannot be constitutionally permissible to ignore the latter. The *SWANCC, Lucas* and *Wilson* cases signal an arrest of this trend, and a recognition that property rights must be protected even if the effect of the failure to do so is not as obvious and immediate as in the human and civil rights arena.

In the SWANCC case, *supra*, the Supreme Court made clear that the unilateral expansion of Corps' jurisdiction under CWA regulations would not be allowed to continue in a limitless fashion. The Court unambiguously stated that Congress in enacting the CWA thought its authority was "over waters that were or had been navigable in fact or which could reasonably be made so." *Id.* at 172, 121 S.Ct. 675. Justice Steven wrote disapprovingly in dissent of the new lines drawn by the Court, but

---

**7.** An exception to the general rule is *United States v. Wilson,* 133 F.3d 251 (4th Cir.1997).

his description states well the reach of the SWANCC decision, "In its decision today, the Court draws a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each." *Id.* at 176–77, 121 S.Ct. 675; *see also Id.* at 168 n. 3, 121 S.Ct. 675. Even before the Supreme Court cast doubt on the expanding jurisdiction of the Corps, the United States Court of Appeals for the Fourth Circuit ruled that the Corps was asserting its CWA jurisdiction in a "sweeping and constitutionally troubling manner." *Wilson,* 133 F.3d at 257.

In order for the Corps to successfully establish a *prima facie* case for a violation of CWA sections 301(a) and 404(a), it must show the defendants are (1) persons who (2) discharged a pollutant from a point source (3) into wetlands (4) that qualify as jurisdictional "waters of the United States" (5) without a permit issued under CWA section 404. *See* 33 U.S.C. §§ 1311(a), 1344 and 1362 (definitions); *see generally U.S. v. Deaton,* 209 F.3d 331, 334–35 (4th Cir.2000). There is no issue as to elements (1), (2), (3) and (5). The Defendants attack the fourth prong of this test, denying that the wetlands on the property qualify as jurisdictional waters of the United States.

Both sides stipulate to the fact that the wetlands on the property do not extend continuously to the Intracoastal Waterway. Order on Final Pre–Trial Conference at 2. Therefore, the Court FINDS that the wetlands are not adjacent to the closest navigable water to the north, which is the Intracoastal Waterway. The only other navigable water in the general vicinity of the property is the Northwest River, which lies to the south. Although the Corps argues otherwise, the Court FINDS as a fact that the wetlands on the property do not extend continuously to the Northwest River. Accordingly, the Court FINDS that the wetlands on the property are not adjacent to navigable water.

## SURFACE WATER OR HYDROLOGICAL CONNECTION

The Corps relies on a "surface water connection" and a "hydrological connection" as an alternate basis for jurisdiction over these wetlands. Neither term is mentioned in the 1986 regulations or earlier versions. While both terms are used, they are each based upon the existence of a perceptible ordinary high water mark ("OHWM"), which the Corps claims convert drainage ditches and ephemeral streams into waters of the United States. The drainage ditches upon which the Corps rests its claims are those which connect the wetlands to Cooper's ditch, which flow generally north to the Intracoastal Waterway, and that single ditch which connects the wetlands to the St. Brides ditch, an ephemeral stream, which flows south toward the Northwest River.

This Court found in *U.S. v. Newdunn,* 195 F.Supp.2d 751 (E.D.Va.2002) ("Newdunn"), that the Corps's 1986 regulations exceeded the authority granted by the CWA by substituting the term "waters of the United States" for "navigable waters" as the Corps' basis for jurisdiction. *See also* Steven M. Silverberg, et al., *Wetlands and Coastal Zone Regulation and Compliance* § 6.9, at 122 (1993). While Newdunn is material to this decision, the facts in this case are arguably distinguishable. The Corps' reliance in this case upon a surface water connection or hydrological connection is in turn based upon its regulatory application of the term OHWM.

The 1975 regulations, which rely upon navigable waters as the basis for Corps' jurisdiction, include the following:

'Navigable waters' . . . for the purposes of this section shall include the following waters:

> (e) All tributaries of navigable waters of the United States up to their headwaters and landward to their ordinary high water mark. 33 C.F.R. 209.120(2)(i)(e) (1975).

The Court **FINDS** that this language refers to the OHWM caused by the landward or upstream flow of waters flowing from navigable waters.

The 1986 preamble contains the following language, "[I]n the absence of wetlands, the upstream limit of Corps jurisdiction also stops when the OHWM is no longer perceptible." 51 Fed.Reg. 41,217. This language appears to be consistent with the 1975 regulation. However, the 1986 regulations omit the upstream component contained in the 1986 preamble[8] by defining jurisdiction as follows:

> Non–Tidal Waters of the United States. The limits of jurisdiction in non-tidal waters:
>
> > (1) In the absence of adjacent wetlands, the jurisdiction extends to the ordinary high water mark[.] 33 C.F.R. § 328.4(c).

By 2000, the upstream or landward component associated with the OHWM as a basis for Corps jurisdiction either disappeared or was ignored. Thus the Corps now uses OHWM as a basis for asserting jurisdiction over ephemeral streams, drainage ditches and the newly coined term, "waterbody." Thus instead of Corps jurisdiction ending at the upstream or landward limit of the perceptible OHWM caused by the flow from navigable waters, the Corps now bases its jurisdiction upon any perceptible OHWM caused by the flow of water toward navigable waters. It is clear from all of the evidence as well as

from the testimony of Corps expert witness Robert Berg that the only connection between the wetlands on the property and navigable waters of the United States are drainage ditches and ephemeral streams. The Corps then claims that rain and water flow into these ditches and streams at various places and at various seasons of the year create a perceptible OHWM, and each thereby become waters of the United States which in turn serve as a surface water or hydrological connection between the wetlands and navigable waters.

The Court **FINDS** that when the Congress passed the CWA it did not vest the Corps with the power to expand its jurisdiction by continually redefining the jurisdiction which the act granted it. With respect to the import of the OHWM, the Corps did not simply amend its effect upon jurisdiction, it stands the effect of an OHWM on its head. In its 1975 regulations, the applicable limit of the Corps' jurisdiction was the perceptible OHWM caused by the upstream or landward flow *from* navigable water, but by 2000, and in this case, it is the perceptible OHWM caused by the flow of water *toward* navigable waters. The Court **FINDS** that the Corps' reinterpretation of the jurisdictional significance of an OHWM is not entitled to Chevron deference, and is an invalid extension of Corps jurisdiction. *See SWANCC*, 531 U.S. at 172, 121 S.Ct. 675. The facts presented at trial clearly fail to establish jurisdiction based upon pre–1986 regulations.

The Corps argues that since water from these wetlands may sometimes enter navigable waters via drainage ditches and ephemeral streams it should and does have jurisdiction over such wetlands. When carried to its logical extreme this argu-

---

8. At some points, the Corps appeared to argue that the preamble does not have the force of a regulation itself, while in other circumstances

it appears that it relied upon the preamble. If such a distinction is valid, it is of no assistance to the Corps here.

ment means that any mountain stream, drainage ditch, culvert or artificial watercourse which eventually enters navigable water, even sporadically, and which possesses a perceptible OHWM would contain waters of the United States subject to Corps jurisdiction. Again, the Corps can persuasively make an argument that this should be so from an environmental standpoint, but it cannot support such an argument based upon any valid regulation promulgated in accordance with the CWA.

■ Even under the Corps 1986 regulations, the wetlands are not jurisdictional. Under the alternate theory presented by the Corps, it has jurisdiction because the wetlands on the property are adjacent to tributaries of navigable waters, as opposed to being adjacent to navigable waters themselves. Even under the Corps' regulations, it is clear that in order for a "non-tidal water" to be a tributary it must be capable of having an OHWM. Even under the Corps' expansive interpretation of its own regulations, there would have to be an OHWM flowing continuously from the wetlands to navigable water. To demonstrate the existence of a continuous OHWM, the Corps relied upon the expert testimony of George Richard Whittecar, Jr. According to the Whittecar, surface water would need to flow uphill from the wetlands in a northerly direction to create a high water mark from the property to navigable water. The Court rejects the factual basis for this testimony, and therefore does not accept his opinion. Thus, the surface water or hydrological connection must rest upon Berg's expert testimony. Berg located and photographed what he claimed were OHWMs along the drainage ditches in question, as well as the St. Brides ditch. The Defendants' evidence questioned whether Berg's designations were genuine OHWMs, and also showed many interruptions of the allegedly continuous OHWMs. Further, the defense evidence included photographs which showed the general ar-

eas photographed by Berg as being entirely dry and filled with vegetation at other times of the year. The Corps bears the burden of proving that the wetlands are jurisdictional. The Court FINDS that the Corps' evidence does not establish that the drainage ditches and ephemeral streams in issue are waters of the United States even under the Corps' 1986 regulations as currently interpreted. This factual finding is based upon the Corps' failure to establish a continuous OHWM in the drainage ditches and ephemeral streams. The Corps argues that man-made obstacles, such as catch basins and culverts, are not considered interruptions of a continuous OHWM, but the Corps' evidence fails to establish the required continuity even if man-made obstacles are disregarded.

The Corps counters by arguing that the drainage ditches were man-made through wetlands and even St. Brides ditch, now an ephemeral stream, was made by man as long as a century ago. This argument is circuitous, as the Corps must rely on the drainage ditches as the surface water or hydrological connection and it cannot then complain about particular man-made features in the man-made ditches.

The Defendants assert other defenses, for example, they complain that although the 1986 regulations state that the Corps generally excludes non-tidal drainage and irrigation ditches excavated on dry land from its definition of tributaries over which it asserts jurisdiction, it reserves the power to claim jurisdiction over such ditches on a "case-by-case basis." 51 Fed.Reg. 41,217 (1986). Having found the Corps lacks jurisdiction, the Court need not rule upon this or other issues raised by the Defendants.

## CONCLUSION

The Court FINDS that the wetlands are not adjacent to the navigable Intracoastal Waterway to the north based upon the

parties stipulation. The Court further FINDS as a fact that the wetlands on the property are not continuous to the navigable Northwest River to the south. Thus, jurisdiction has not been established based upon the adjacency of the wetlands to navigable water. As to the Corps' alternate claim that there is a surface water or hydrological connection between the wetlands and a tributary to navigable waters, the Court FINDS that the Corps acted impermissibly when it adopted regulations in 1986 and thereafter which eliminated the upstream or landward component of ordinary high water mark jurisdiction. The Court further finds as a fact that the Corps's evidence has not proven jurisdiction based upon the pre–1986 regulations or based upon the 1986 and post–1986 regulations.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.