**FD & P ENTERPRISES, INC., a New Jersey Corporation, Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS., Defendants.**

**Civil Action No. 99–3500 (HAA).**

United States District Court, D. New Jersey.

Jan. 15, 2003.

Marc D. Haefner, Agnes Antonian, Kevin J. Coakley, Connell Foley, LLP, Roseland, NJ, for Plaintiff.

John C. Cruden, Scott J. Jordan, Steven E. Rusak, United States Department of Justice, Washington, DC, Robert J. Cleary, Susan Handler–Menahem, United States Attorney's Office, Newark, NJ, James G. Palmer, United States Army Corps of Engineers, New York, NY, for Defendants.

## OPINION & ORDER

ACKERMAN, Senior District Judge.

This matter comes before the court on Plaintiff's motion for summary judgment. For the reasons outlined below, Plaintiff's motion is DENIED.

### I. Factual and Procedural Background

Plaintiff FD & P Enterprises ("FD & P") is a corporation engaged in providing freight transportation services to the New York–New Jersey metropolitan area. FD & P owns a 100–acre property located on Secaucus Road in Jersey City, New Jersey ("the FD & P Property"). FD & P hopes to construct an intermodal rail facility on the FD & P Property, which would be used for transferring cargo from trains to trucks. The FD & P Property lies along the eastern edge of the Hackensack Meadowlands. The western border of the FD & P Property is adjacent to Penhorn Creek, a non-navigable tributary of the Hackensack River. United States' Response to Plaintiff's Statement of Uncontested Material Facts ("Defendant's Facts"), ¶ 2, 4.

The Hackensack River is a navigable body of water used in interstate commerce. More than a dozen creeks and ditches contribute water to the Hackensack River in the Meadowlands. Declaration of Kevin J. Coakley in Support of Plaintiff's Motion for Summary Judgment ("Coakley Declaration"), at 425. The United States Army Corps of Engineers ("the Corps") has deemed 77.0 acres of the FD & P Property to be wetlands, as defined in 33 C.F.R. § 328.3(b).[1] Defendant's Facts, ¶ 2. As part of the construction of the intermodal facility, FD & P plans to fill 53.5 acres of the wetlands on its property. Plaintiff's Statement of Uncontested Material Facts ("Plaintiff's Facts"), ¶ 14.

In order to legally construct the intermodal facility, FD & P applied to the Corps for a permit under Section 404 of the Clean Water Act ("CWA") on December 18, 1992. Nearly seven years of negotiations between FD & P and the Corps followed, during which various proposals for mitigation of the losses of wetlands caused by FD & P's project were considered and rejected by both sides. FD & P filed this action on July 23, 1999, and filed an amended complaint on July 26, 2000. FD & P now seeks summary judgment on Count II of its amended complaint, alleging that the Corps lacks jurisdiction over the wetlands in question.

## II. Jurisdiction Under the Clean Water Act

The issue presented to the court in this case is straightforward: does the CWA confer jurisdiction over wetlands abutting a non-navigable tributary, which feeds into a navigable body of water?

Section 404(a) of the CWA, 86 Stat. 884, as amended, 33 U.S.C. § 1344(a), regulates the discharge of dredged or fill material into "navigable waters." Under the statute, the Corps may issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (2002). The statute defines the term "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (2002).

The Corps has promulgated the following regulations to interpret these provisions of the CWA:

(a) The term 'waters of the United States' means

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

---

**1.** 33 C.F.R. § 328.3(b) states as follows:

(b) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

While the Corps' Statement of Uncontested Material Facts lists the wetlands as 77.0 acres, FD & P indicates in its submissions that 78.9 acres of the FD & P Property were deemed wetlands. For purposes of this issue, this court will accept the 77.0 figure.

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section.

33 C.F.R. § 328.3(a) (2002).

In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), the Supreme Court interpreted the CWA and the Corps' corresponding regulations as follows:

> Congress chose to define the waters covered by the Act broadly. Although the Act prohibits discharges into 'navigable waters,' ... the Act's definition of 'navigable waters' as 'the waters of the United States' makes it clear that the term 'navigable' as used in the Act is of limited import. In adopting this definition of 'navigable waters,' Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term. (internal citations omitted) ... [T]he evident breadth of congressional concern for protection of water quality and aquatic ecosystems

suggests that it is reasonable for the Corps to interpret the term 'waters' to encompass wetlands adjacent to waters as more conventionally defined.

474 U.S. at 133, 106 S.Ct. 455.

Therefore, the *Riverside Bayview* court concluded that, given "the inherent difficulties of defining precise bounds to regulable waters," wetlands which are not themselves navigable bodies of water may nonetheless be regulated under the CWA when they are adjacent to navigable waters. 474 U.S. at 133, 106 S.Ct. 455. It is important to note that the Court in *Riverside Bayview* explicitly declined to extend its holding to cases involving wetlands adjacent to non-navigable waters. *See id.* ("[w]e are not called upon to address the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water ... and we do not express any opinion on that question.").

Despite this limiting language, most courts, including the Third Circuit, held that the reasoning of *Riverside Bayview* extended CWA jurisdiction to wetlands adjacent to nonnavigable tributaries which flowed into navigable waters. Thus, in *United States v. Pozsgai*, 999 F.2d 719 (3d Cir.1993), the defendant discharged fill material into wetlands adjacent to a nonnavigable stream, which flowed into the Pennsylvania Canal, a navigable waterway. 999 F.2d at 730. Under these circumstances, the Third Circuit held that the CWA conferred jurisdiction upon Pozsgai's filling activities. Citing to the legislative history of the CWA, the court noted that " '[t]he conferees fully intend[ed] that the term 'navigable waters' be given the broadest possible constitutional interpretation ...' " 999 F.2d at 727 (citing S.Conf. Rep. No. 1236, 92d Cong., 2d Sess. 144, U.S.Code Cong. & Admin. News 1972, 3668). Other circuits reached similar con-

clusions. *See, e.g., Quivira Mining Co. v. EPA,* 765 F.2d 126 (10th Cir.1985) *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *United States v. TGR Corp.,* 171 F.3d 762 (2d Cir.1999); *Conant v. United States,* 786 F.2d 1008 (11th Cir. 1986) (all holding that the CWA authorized the Corps to regulate wetlands adjacent to non-navigable tributaries of navigable waters).

Until recently, therefore, the law on this issue was relatively clear. The Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), however, has limited the scope of the CWA. *Solid Waste* involved several ponds that had formed in pits that were originally part of a sand and gravel mining operation. Although the ponds were completely isolated from any navigable waters and the entire area in question was within the state of Illinois, the government argued that it had jurisdiction over the area under an Army Corps of Engineers regulation known as the "Migratory Bird Rule." *See id.* at 163, 121 S.Ct. 675. The Migratory Bird Rule states that § 404(a) of the CWA extends to intrastate waters "[w]hich are or would be used as habitat by other migratory birds which cross state lines." *Id.* at 164, 121 S.Ct. 675 (quoting 51 Fed.Reg. 41217).

The Supreme Court held that federal regulation of the waters at issue in *Solid Waste* under the Migratory Bird Rule exceeded the authority granted to the Corps under the CWA. In reaching this conclusion, the Court did not overturn *Riverside Bayview,* but instead reasoned as follows:

It was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes.* In order to rule for [the government], we would

have to hold that the jurisdiction of the Corps extends to ponds that are not adjacent to open water. But we conclude that the text of the statute will not allow this.

531 U.S. 159, 167–168, 121 S.Ct. 675, 148 L.Ed.2d 576.

In analyzing the meaning of "navigable waters" under the CWA, the Court acknowledged its prior holding that "the word 'navigable' in the statute was of 'limited import'". *Id.* at 682–683 (quoting *Riverside Bayview,* 474 U.S. 121 at 133, 106 S.Ct. 455, 88 L.Ed.2d 419). Nevertheless, the Court concluded that "it is one thing to give a word limited effect and quite another to give it no effect whatever. The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 683.

In the wake of *Solid Waste,* courts have struggled with evaluating the jurisdictional reach of § 404(a) of the CWA. Because the Third Circuit has not yet spoken on this issue, this court must look to other federal jurisdictions for guidance. Courts interpreting the scope of *Solid Waste* have essentially split into two camps. Under one reading, the *Solid Waste* case represents a significant shift in the Court's CWA jurisprudence, calling into question the continuing validity of CWA jurisdiction over waters which are not either actually navigable or directly adjacent to navigable waters. On the other hand, an alternative reading of *Solid Waste* holds that the case applied only to "isolated waters," and thus would permit continued CWA jurisdiction over all waters which have at least a minimal hydrological connection to navigable waters. The Corps argues that the latter view is the correct interpretation of *Solid*

*Waste,* while FD & P urges this court to adopt the former view.

The Fifth Circuit has interpreted *Solid Waste* to substantially limit CWA jurisdiction, holding that under the Supreme Court's reasoning, "a body of water is subject to regulation under the CWA if the body of water is actually navigable or is adjacent to an open body of navigable water." *See, e.g., D.E. Rice v. Harken Exploration Co.,* 250 F.3d 264, 269 (5th Cir. 2001).[2] This interpretation of *Solid Waste* was adopted by the court in *U.S. v. Rapanos,* 190 F.Supp.2d 1011 (E.D.Mich.2002), a case with facts quite similar to that of the instant case. In *Rapanos,* the defendant filled wetlands on his property. The wetlands emptied into a ditch which flowed into a non-navigable creek, which ultimately flowed into the navigable Kawakawlin River, some twenty miles from the defendant's property. 190 F.Supp.2d at 1014–15. The Corps argued that it had CWA jurisdiction over the defendant's wetlands because the wetlands were hydrologically connected to navigable waters. Judge Zatkoff began his analysis with the following observation:

> It is worth noting that the majority opinion in *Solid Waste* repeatedly refers to the wetlands at issue in that case as 'isolated,' despite the fact that, as the dissent points out, even the most seemingly 'isolated' wetlands are in fact both hydrologically connected, as well as ecologically connected, to navigable waters. (internal citations omitted). The dissent

notes that the wetlands in *Solid Waste* are at least ecologically connected ... Despite this, the majority still refers to the wetlands as isolated, indicating what is likely a significant shift in its CWA jurisprudence. This leads the Court to conclude that even if there is a hydrological connection, Defendant's wetlands may be considered 'isolated' for purposes of the CWA.

*Id.* at 1014 n. 3.

Judge Zatkoff noted that the basic principles articulated in *Riverside Bayview* remain good law: "[b]ecause the goal of the CWA is to curtail water pollution ... federal jurisdiction must encompass some non-navigable water." *Id.* at 1016. Where, for example, toxic chemicals are discharged into wetlands adjacent to navigable waters, "that chemical would undoubtedly affect the navigable body of water," and therefore CWA jurisdiction over these hypothetical wetlands would be appropriate. *Id.* Nonetheless, under the jurisdictional limits articulated in *Solid Waste,* Judge Zatkoff concluded that the CWA did not confer jurisdiction over wetlands which were merely adjacent to non-navigable tributaries of navigable waters. A number of courts have reached similar conclusions. *See, e.g., U.S. v. RGM Corp.,* 222 F.Supp.2d 780 (E.D.Va.2002), (holding that the CWA does not confer jurisdiction over wetlands adjacent to ephemeral ditches and streams which only occasionally flow into navigable waters).

---

**2.** In *D.E. Rice,* the plaintiff-landowners sought damages under the Oil Pollution Act ("OPA"), for damage to their land allegedly caused by the defendant's discharge of pollutants into Big Creek and its unnamed tributaries. *See Rice,* 250 F.3d at 265. Although the case was brought under the OPA, the court followed precedent under the CWA to define the term 'navigable waters' under the OPA, noting that "Congress generally intended the term 'navigable waters' to have the

same meaning under the OPA and the CWA." *Id.* at 267. The court first refused to extend OPA jurisdiction to groundwater, because groundwater is not included within the class of waters protected by the CWA. *Id.* at 270. Additionally, the court found that it would be an "unwarranted expansion" of the OPA to find that discharges onto land that only infrequently carried running water were discharges into navigable waters. *Id.* at 271.

Leading the other side of the debate, the Ninth Circuit adopted a reading of *Solid Waste* which would leave the scope of CWA jurisdiction unaltered. In *Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526 (9th Cir.2001), the defendant was applying herbicide to nonnavigable irrigation canals which flowed into tributaries of navigable waters. The Ninth Circuit distinguished *Solid Waste*, noting that the waters at issue in that case were "isolated waters." The irrigation canals in *Headwaters*, by contrast, "receive water from natural streams and lakes, and divert water to streams and creeks," and therefore "it is incontestable that substantial pollution of one not only may but very probably will affect the other." 243 F.3d at 533–34 (quoting *United States v. Ashland Oil and Transp. Co.*, 504 F.2d 1317, 1329 (6th Cir. 1974)). In analyzing the CWA and the Corps' regulations, the court concluded that non-navigable tributaries of navigable waters are "waters of the United States," and therefore are equivalent to navigable waters for purposes of the CWA jurisdictional analysis. The court cited to several pre-*Solid Waste* cases holding that the CWA confers jurisdiction on nonnavigable waters flowing into non-navigable tributaries of navigable waters. *Id.* at 533 (citing, *e.g.*, *United States v. TGR Corp.*, 171 F.3d 762 (2d.Cir.1999)). Thus, the Ninth Circuit concluded that *Solid Waste* applied only to isolated waters with no hydrological connection to navigable waters. *Headwaters*, 243 F.3d at 533–34.

Similarly, in *United States v. Interstate General Co.*, 152 F.Supp.2d 843 (D.Md. 2001), the court refused to overturn a defendant's conviction for unlawfully filling wetlands which were adjacent to non-navigable tributaries of navigable waters. The court reasoned that "[b]ecause the Supreme Court only reviewed 33 CFR § 328.3(a)(3), it would be improper for this Court to extend the *Solid Waste* court's ruling any further than they clearly intended." *Id.* at 847. Finally, in *United States v. Lamplight Equestrian Center, Inc.*, 2002 WL 360652 (N.D.Ill.2002), the court began its analysis by noting that, in light of *Solid Waste*, "the critical issue" in assessing CWA jurisdiction "is whether there is a significant nexus" between the wetlands at issue and navigable waters. *Id.* at *6. In analyzing this question, the court held that "a tributary need not have a direct connection to the navigable water, but may be linked through other connections two or three times removed from the navigable water and still be subject to the Corps' jurisdiction." *Id.* at *8.

In the context of analyzing the two divergent views outlined above, it is helpful to review the origins and purposes of the CWA. Congress passed the CWA for the stated purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2002). The CWA was the culmination of a series of legislative measures passed in response to the problem of heavily polluted waters throughout the country, typified by a 1969 fire on the Cuyahoga River in Cleveland caused by a slick of industrial waste. *Solid Waste*, 531 U.S. 159, 174–75, 121 S.Ct. 675, 148 L.Ed.2d 576 (Stevens, J., dissenting). Congress passed the legislation with the goal of ending water pollution in this nation altogether by 1985. While that goal has not yet been reached, case law prior to *Solid Waste* provided the government with wide latitude in utilizing the CWA to halt pollution.

As many of the cases cited above have pointed out, a reading of *Solid Waste* which would confine CWA jurisdiction solely to navigable waters and those waters one step removed from navigable waters could ultimately serve to undermine the basic purposes of the CWA. Indeed,

courts which have read *Solid Waste* as continuing to permit broad CWA jurisdiction doubtless fear the specter of pollution harmful to the "chemical, physical, and biological integrity" of navigable waters, yet remaining beyond the reach of the CWA. *See, e.g., United States v. Buday,* 138 F.Supp.2d 1282 (D.Mont.2001) (holding that CWA confers jurisdiction over tributaries "thrice removed from navigable waters" because "tributaries that are distant from but connected to navigable waters are ecologically capable of undermining the quality of the navigable water.").

As Justice Stevens pointed out in his dissent, the CWA represented a "shift in the focus of federal water regulation from protecting navigability toward environmental protection." 531 U.S. at 179, 121 S.Ct. 675. Therefore, 33 U.S.C. § 1362(7), which defined "navigable waters" as "waters of the United States" essentially deleted the navigability requirement from the statute. *Id.* at 182, 121 S.Ct. 675. Thus, in the pre-*Solid Waste* world, the CWA conferred jurisdiction over any water so long as there was even the most minimal hydrological connection between that water and navigable waters.

Nevertheless, we are obligated to read the CWA in light of the Supreme Court's most recent interpretation of that statute. This court believes that *Solid Waste* represents a clear statement from the Supreme Court on the scope of CWA jurisdiction. Therefore, the framework which the Court has established must be faithfully followed in accordance with the well-known doctrine of *stare decisis.* In light of *Solid Waste,* it is the view of this court that the "hydrological connection" test is no longer the valid mode of analysis. In this context, the language of Chief Justice Rehnquist's opinion is instructive: it is "the significant nexus between the wetlands and 'navigable waters'" that must inform our reading of the CWA. 531 U.S. at 168, 121 S.Ct. 675. Because, as Justice Stevens points out, *Solid Waste* has substantially altered the meaning of "navigable waters" in the CWA, a "significant nexus" must constitute more than a mere "hydrological connection."[3] Therefore, this court must reject the Corps' reading of *Solid Waste,* which this court believes would essentially ignore the Supreme Court's instructions and maintain the "hydrological connection" status quo.[4]

Thus, turning to the facts of the instant case, the question presented is whether there is a substantial nexus—beyond a mere hydrological connection—between

---

**3.** This court does note that in his dissent, Justice Stevens characterized the *Solid Waste* majority as "draw[ing] a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each." 531 U.S. 159, 176–77, 121 S.Ct. 675, 148 L.Ed.2d 576 (Stevens, J., dissenting). Notwithstanding Justice Stevens's analysis, this court believes that this interpretation understates the extent to which *Solid Waste* altered the scope of CWA jurisdiction.

**4.** As an alternative, the Corps argues that its interpretation of the CWA should be entitled to deference under *Chevron U.S.A. Inc. v. Nat-*

*ural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Supreme Court in *Solid Waste* declined to extend *Chevron* deference to the Corps, noting that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *Id.* at 172, 121 S.Ct. 675 (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). Because the instant case involves a similar analysis as that undertaken in *Solid Waste,* this court concludes that *Chevron* deference is inappropriate here.

the FD & P Property and the navigable waters of the Hackensack River. As noted above, both parties agree that the wetlands on the FD & P Property drain into Penhorn Creek, which flows into the Hackensack River one mile away from the wetlands. As a general matter, wetlands stabilize and incorporate inorganic sediments and chemicals, a process which benefits downstream waters. Coakley Declaration, at 441–442. The Corps argues that, given the proximity of the wetlands on the FD & P Property to the Hackensack River, filling of the wetlands would have an injurious impact on the river by increasing the sediments and chemicals flowing into the river. The Corps further argues that because the FD & P Property is within the 100–year flood plain, the proposed fill will displace flood storage capacity, increasing the likelihood of rain-induced flooding.

FD & P, on the other hand, asserts that the wetlands on the FD & P Property do not provide any environmental benefits to either Penhorn Creek or the Hackensack River, and therefore the placement of fill onto the wetlands will not be detrimental to the river. Declaration of Agnes Antonian in Support of Plaintiff's Motion for Summary Judgment ("Antonian Declaration"), Ex. A. In fact, FD & P argues, placement of fill will actually enhance the water quality of Penhorn Creek and the Hackensack River, because FD & P plans to install catch basins and storm-water retention basins, which will trap sediment from the FD & P Property. *Id.* Moreover, FD & P argues that because the FD & P Property is located at the lowest point in the Meadowlands watershed, the wetlands do not provide any flood storage function, and therefore filling the FD & P Property will not impact the likelihood of flooding. *Id.*

If the relevant standard before this court was whether the FD & P wetlands had a "hydrological connection" to the Hackensack River, this court could easily dispose of this matter on summary judgment: because water flows from the wetlands through Penhorn Creek and into Hackensack River, there is a hydrological connection between the wetlands and a navigable body of water, and therefore the Corps would properly have jurisdiction over the FD & P Property under the CWA. As discussed above, however, "hydrological connection" is no longer the relevant standard to be applied in this case. Instead, this court must determine whether there is a substantial nexus between the FD & P Property and the Hackensack River.

▇ In light of *Solid Waste*, this court was strongly tempted to grant summary judgment in favor of FD & P. If, as FD & P asserts, the filling of the wetlands will not be detrimental to the Hackensack River, then there is no substantial nexus, and therefore no CWA jurisdiction. Nevertheless, the evidence submitted by the parties does not permit this court to conclude that no genuine issue of material fact exists as to the effect of the filling of the wetlands on the Hackensack River. The Corps has submitted sufficient evidence such that a reasonable jury could find that the filling of the wetlands will have a substantial injurious impact upon the chemical, physical, and/or biologcial integrity of the Hackensack River. Under these circumstances, there would be a substantial nexus between the wetlands and the river, and the Corps would have jurisdiction under the CWA. Because the court cannot resolve this factual issue based upon the record before it, a genuine issue of material fact exists as to whether there is a substantial nexus between the FD & P wetlands and the Hackensack River. Therefore, this court must deny FD & P's motion for summary judgment.

### III. Commerce Clause Claim

FD & P additionally argues that the Corps' assertion of jurisdiction over the FD & P wetlands violates the Commerce Clause of the United States Constitution. This claim may be dealt with briefly. First, it is important to note that while *Solid Waste* altered the Court's jurisprudence with respect to the interpretation of the CWA, that case did not touch on Congress's authority to regulate waters under the Constitution. Therefore, the extensive jurisprudence holding that CWA jurisdiction over wetlands such as those in the instant case is permissible—as a Constitutional matter—remains good law.

■ In *United States v. Lopez*, 514 U.S. 549, 558–559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court identified "three broad categories of activity that Congress may regulate under its commerce power": (1) channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons and things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. The wetlands at issue in this case fall under the third category. As Justice Stevens noted in his *Solid Waste* dissent, "[t]here can be no doubt that, unlike the class of activities Congress was attempting to regulate in *United States v. Morrison*, 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ('[g]ender-motivated crimes'), and *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624 (possession of guns near school property), the discharge of fill material into the Nation's waters is almost always undertaken for economic reasons." 531 U.S. 159, 193, 121 S.Ct. 675, 148 L.Ed.2d 576 (Stevens, J., dissenting). In this case, FD & P's purpose for seeking the § 404 permit to construct a commercial facility. Indeed, this commercial facility would be engaged in interstate freight transportation services. As such, FD & P's argu-

ment that its filling activities would not "substantially affect" interstate commerce must fail.

For the foregoing reasons, on this 15th day of January, 2003, it is hereby ORDERED that FD & P's Motion for Summary Judgment is DENIED.