# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 26, 2022

Lyle W. Cayce
Clerk

No. 21-30028

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ERR, LLC; EVERGREEN RESOURCE RECOVERY, LLC; HUGH
NUNGESSER, JR.,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-cv-2340

Before DAVIS, WILLETT, and OLDHAM, *Circuit Judges*.

ANDREW S. OLDHAM, *Circuit Judge*:

The question presented is whether the Seventh Amendment guarantees the right to a jury trial of the Government's claims under the Oil Pollution Act of 1990. The district court said it was a close call but ultimately answered no. We say yes. We therefore reverse in part, vacate in part, and remand.

No. 21-30028

I.

A.

First, some background on the legislative scheme. In 1990, Congress enacted the Oil Pollution Act ("OPA"), which amended the Clean Water Act ("CWA"). *See* 33 U.S.C. § 2701 *et seq.* The OPA was Congress's "response to the Exxon Valdez oil spill in Prince William Sound, Alaska, and was intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 (5th Cir. 2001). The OPA generally imposes strict liability on parties responsible for oil spills, subject to certain complete defenses. *See* 33 U.S.C. §§ 2702, 2703; *see also Rice*, 250 F.3d at 266; *In re Needham*, 354 F.3d 340, 344 (5th Cir. 2003); *United States v. Am. Com. Lines, LLC*, 875 F.3d 170, 174 (5th Cir. 2017).

Congress also created a way for those who clean up an oil spill to get paid quickly. In general, cleaners must first present their claims to the party putatively responsible for the spill. *See* 33 U.S.C. § 2713(a), (b). But if the party denies liability or has not paid the claim within 90 days, the claimant may elect to sue that party or seek repayment from the National Pollution Funds Center ("NPFC"), which administers the Oil Spill Liability Trust Fund ("Fund"). *See generally id.* §§ 2712, 2713; Exec. Order No. 12,777, § 7, 56 Fed. Reg. 54,757, 54,766–68 (Oct. 18, 1991).[1] If the claimant elects

---

[1] The Fund's resources generally come from environmental taxes on crude oil and certain petroleum products, payments received from specified environmental fines and penalties, and removal costs paid to the Fund. *See* 26 U.S.C. § 9509; *see also United States v. Hyundai Merch. Marine Co.*, 172 F.3d 1187, 1192 (9th Cir. 1999) ("Funds recovered for removal costs are paid to the Oil Spill Liability Trust Fund, which is available to the President for the payment of removal costs." (citing 33 U.S.C. §§ 2706(f), 2712(a)(1))).

repayment from the NPFC, then it will get all removal expenses that are necessary, reasonable, and consistent with the relevant statutory criteria for such payments. *See* 33 U.S.C. § 2713(c); *see also* 33 C.F.R. §§ 136.105, 136.203, 136.205. And if the Fund pays the removal expenses, then the Government receives by subrogation "all rights, claims and causes of action that the claimant has." 33 U.S.C. § 2715(a); *see also id.* § 2712(f). The NPFC may then seek recoupment from the responsible party, including by filing a lawsuit. *See id.* § 2715(c). The recoupment includes "interest . . . , administrative and adjudicative costs, and attorney's fees." *Ibid.*

B.

Now, the facts and procedural history. ERR owns and operates a wastewater treatment facility on the west bank of the Mississippi River in Louisiana.[2] Throughout May 12, 2015, ERR's facility received a transfer of oily water from a slop-oil barge. While still at the facility, at about 11:45 p.m., the barge tankerman noticed a discoloration in the water near the barge. Just after midnight, the barge left ERR's facility and traveled upstream via a tugboat. The National Response Center that same morning received two reports of oil in the Mississippi River—downstream from ERR's facility.

The Coast Guard and the State of Louisiana sent people to investigate. Their investigation included taking samples of the oil from the river, the barge, and ERR's facility. And they concluded ERR was responsible for the spill.

---

[2] There are two other defendants in this action, both of which are connected to ERR, LLC. Hugh Nungesser, Jr. is one of ERR's members. Nungesser was also a member of Evergreen Resource Recovery, LLC, which at some point operated the same treatment facility as ERR. Unless otherwise expressly noted, we refer to the defendants collectively as "ERR."

No. 21-30028

Meanwhile, from May 13, 2015, to June 26, 2015, Oil Mop, LLC—one of ERR's designated spill contractors—performed oil removal and soil remediation. On July 22, 2015, Oil Mop submitted its bill of $793,228.74 to ERR. ERR refused to pay. After 90 days passed, Oil Mop submitted a claim of $651,767.26 to the NPFC for reimbursement of removal costs. The NPFC reimbursed Oil Mop $631,228.74.

On October 20, 2017, the NPFC billed ERR for what it paid Oil Mop. ERR again refused to pay. The Government then sued ERR for what it paid Oil Mop, its administrative-adjudication costs, attorney's fees, and interest.

ERR demanded a jury trial. The Government moved to strike the demand. And the district court agreed with the Government. In general, the Seventh Amendment guarantees a jury "[i]n Suits at common law." U.S. Const. amend. VII. The district court held, however, that the Government's OPA claims sound not in law but in equity, because the Government sought the equitable remedy of restitution.

In October 2020, the district court held a four-day bench trial. Two months later, the court ruled for the Government and awarded removal costs, administrative-adjudication costs, and attorney's fees. ERR timely appealed, challenging the court's denial of the jury-trial demand, its application of the OPA, and its monetary-compensation determination. We have jurisdiction under 28 U.S.C. § 1291. We address only ERR's Seventh Amendment challenge. Our review is *de novo*. *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 416 (5th Cir. 2014).

II.

We begin with (A) some history on the civil jury right. We then discuss (B) Supreme Court precedent interpreting the Seventh Amendment. Finally, we hold (C) the Seventh Amendment guarantees ERR's right to a jury trial here.

No. 21-30028

## A.

First, history. The Constitution, as ratified in 1788, did not contain a right to a jury trial in civil cases. *See* U.S. Const. art. III, § 2, cl. 3 (guaranteeing jury in criminal cases). The omission generated fierce criticism from the Anti-Federalists. As one protested, "jury trials[,] which have so long been considered the surest barrier against arbitrary power, and the palladium of liberty[,] with the loss of which the loss of our freedom may be dated, are taken away by the proposed form of government." Luther Martin's Information to the General Assembly of the State of Maryland, *in* 2 The Complete Anti-Federalist 27, 70 (Herbert J. Storing ed., 1981). As another explained: "Judges, unincumbered by juries, have been ever found much better friends to government than to the people. Such judges will always be more desirable than juries to [would-be tyrants], upon the same principle that a large standing army . . . is ever desirable to those who wish to enslave the people." Old Whig No. 8, *in* 3 The Complete Anti-Federalist, *supra*, at 49. And another emphasized that the civil jury was essential to preserving "democratical balance in the Judiciary power." Hampden No. 2, *in* 4 The Complete Anti-Federalist, *supra*, at 200. Many other Anti-Federalists expressed similar concerns.[3]

---

[3] *See, e.g.*, Federal Farmer No. 4, *in* 2 The Complete Anti-Federalist, *supra*, at 250 (describing jurors as "centinels and guardians" of the people and stating that he is "very sorry that even a few of our countrymen should consider jurors and representatives in a different point of view, as ignorant troublesome bodies, which ought not to have any share in the concerns of government"); Federal Farmer No. 15, *in* 2 The Complete Anti-Federalist, *supra*, at 320 ("The jury trial, especially politically considered, is by far the most important feature in the judicial department in a free country . . . . [B]y holding the jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful controul in the judicial department. . . . [T]he jury trial brings with it an open and public discussion of all causes, and excludes secret and arbitrary proceedings."); Essay of A Democratic Federalist, *in* 3 The Complete Anti-Federalist, *supra*, at 61 ("What refuge shall we then have to shelter us from the iron

No. 21-30028

The Federalists recognized this criticism as one of the Anti-Federalists' most trenchant. *See* THE FEDERALIST NO. 83, at 495 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The objection to the plan of the convention, *which has met with most success in this State*, and perhaps in several of the other States, is that relative to the want of a constitutional provision for the trial by jury in civil cases." (emphasis added)); *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446 (1830) (Story, J.) ("One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases."). Still, Hamilton tried to defend the omission. He expressed doubts that there was an "inseparable connection between the existence of liberty and the trial by jury in civil cases" and downplayed how much the civil jury trial would be "a security against corruption." THE FEDERALIST NO. 83, *supra*, at 499–500. But his main defense for the omission was practical. Hamilton argued that it'd be too difficult to draft a provision that protected the civil jury right. This is because the States provided radically different rights, so it'd be dangerous to draft a provision that covered one. Instead, Hamilton thought it best for Congress to provide the right to a civil jury trial on a case-by-case basis. In Hamilton's own words:

> From this sketch it appears that there is a material diversity, as well in the modification as in the extent of the institution of trial by jury in civil cases, in the several States; and from this fact these obvious reflections flow: first, that no general rule could have been fixed upon by the convention which would have

---

hand of arbitrary power?—O! my fellow citizens, think of this while it is yet time, and never consent to part with the glorious privilege of trial by jury, but with your lives."); Observations on the New Constitution and on the Federal and State Conventions by A Columbian Patriot, *in* 4 THE COMPLETE ANTI-FEDERALIST, *supra*, at 276–77 (worrying that the unamended Constitution would lead to "[t]he abolition of trial by jury in civil causes").

No. 21-30028

corresponded with the circumstances of all the States; and secondly, that more or at least as much might have been hazarded by taking the system of any one State for a standard, as by omitting a provision altogether and leaving the matter, as has been done, to legislative regulation.

*Id.* at 503.

Hamilton lost, however. The American people recognized the power of the Anti-Federalists' criticisms and ratified the Seventh Amendment in 1791. That Amendment provides:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. CONST. amend. VII.

### B.

Next, precedent. The Supreme Court has long understood "Suits at common law" to refer "not merely [to] suits, which the *common* law recognized among its old and settled proceedings, but [to] suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons*, 28 U.S. at 447. So the Seventh Amendment "applies not only to common-law causes of action, but also to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998) (quotation omitted).

7

No. 21-30028

To determine whether a right of action requires a jury trial, we must consider two factors. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull v. United States*, 481 U.S. 412, 417–18 (1987) (citation omitted). The second factor is "more important." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).[4]

## C.

Here, the Government brought two "alternative" claims. The first is a claim under 33 U.S.C. § 2702(a) ("Recoupment Claim"). The second is a claim under 33 U.S.C. §§ 2712(f) and 2715 ("Subrogation Claim"). We address each claim in turn. We conclude (1) ERR has a Seventh Amendment right to a jury trial for the Recoupment Claim. And because of the overlap between the two claims, this conclusion suffices to reverse the district court. *See, e.g.*, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508–10 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472–73 (1962); *Ross v. Bernhard*, 396 U.S.

---

[4] The Supreme Court has also asked whether the particular "trial decision" must be decided by the jury to preserve the jury-trial right. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708, 718–21 (1999); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996) ("If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791."); *see also Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1319–20 (Fed. Cir. 2018) (noting that the Supreme Court has asked the Seventh Amendment question in "two ways," one of which includes the trial-decision issue). The Court looks principally to history, but if history doesn't provide a "clear answer," it considers "precedent and functional considerations." *Monterey*, 526 U.S. at 718; *see also Markman*, 517 U.S. at 384, 388. Neither party addresses this issue. And for good reason: The Government doesn't dispute that juries resolve complex issues like this all the time, including when the Government (or someone else) under the OPA brings an action for damages.

531, 542–43 (1970). In any event, we conclude (2) ERR has a right to a jury trial for the Subrogation Claim.

1.

First, the Recoupment Claim. We begin with (a) the nature of the action. We then tackle (b) the type of remedy. We hold both factors support the conclusion that ERR has a right to a jury trial for the Recoupment Claim.

a.

The nature of the action supports a jury right. The Government's action is, at its foundation, one for tort. And historically, tort claimants had two routes to sue a tortfeasor for monetary compensation. Both involved actions at law that were triable to juries.

The first route allowed victims to bring "[c]ommon-law tort actions . . . under the writs of trespass and trespass on the case. Trespass remedied direct, forcible tortious injuries, while the later developed trespass on the case remedied indirect or consequential harms." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 729 (1999) (Scalia, J., concurring in part) (citation omitted); *see also* Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 VAND. L. REV. 57, 70–72 (1999). The second route allowed victims "to waive the tort and proceed instead in quasi contract." *Monterey*, 526 U.S. at 716–17 (plurality op.). When victims chose the latter route, they sought "through a writ of assumpsit . . . monetary restitution." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1323 (Fed. Cir. 2018) (collecting sources); *see also Fed. Deposit Ins. Corp. v. Bank One, Waukesha*, 881 F.2d 390, 393 (7th Cir. 1989) ("No one doubts—though many regret—that the common law allowed the victim of a tort to elect the quasi-contract claim with its longer period of limitations.").

The OPA mimics these common-law options. The statute first creates a legal duty and then provides a right of action to compensate the injured party for a breach of that duty. *See Curtis v. Loether*, 415 U.S. 189, 195 (1974) ("A damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."); *Monterey*, 526 U.S. at 727 (Scalia, J., concurring in part) ("Like other tort causes of action, [the applicable law] is designed to provide compensation for injuries arising from the violation of legal duties, and thereby, of course, to deter future violations." (citation omitted)); *see also id.* at 709 (majority op.) ("[C]ommon-law tort actions provide redress for interference with protected personal or property interests."). That's just like torts. The OPA even provides the same two options as the common law to get money: (1) an action for *damages* (akin to a writ of trespass or trespass on the case) or (2) an action for *monetary restitution* (akin to writ of assumpsit/quasi-contract).

Here, the Government chose the second route (quasi-contract). It performed the cleanup and then sought reimbursement from ERR. That is a quintessential quasi-contract action. *Cf., e.g.*, *Process Eng'rs & Const'rs, Inc. v. DiGregorio, Inc.*, 93 A.3d 1047, 1053–55 (R.I. 2014) (cited in 42 C.J.S. Implied Contracts § 17 n.1). And such quasi-contract actions sound in law, not equity. *See Monterey*, 526 U.S. at 717 (plurality op.) ("[Q]uasi contract was itself an action at law."). So the first factor supports a right to a jury.

b.

The type of remedy is "more important." *Granfinanciera*, 492 U.S. at 42. And this more-important factor also supports a jury right. All agree that the reimbursement the Government seeks here is a form of restitution. So we start with (i) some background on restitution. We next explain why (ii) the

remedy here is one *at law*. We last reject (iii) the Government's remaining counterarguments.

i.

Background first. It's well-established that restitution can sound in either law or equity. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity."). Restitution *at law* involved "cases in which the plaintiff could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him." *Id.* at 213 (quotation omitted). The plaintiff had a right of action to restitution at law "from the common-law writ of assumpsit." *Ibid.* These claims were "considered legal because [the plaintiff] sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money. Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied)." *Ibid.* (quotation omitted).

By contrast, restitution *in equity* ordinarily required identification of particular property or funds in the wrongdoer's possession traceable to the victim. *Ibid.* "A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner." *Ibid.* Simply put, for restitution *in equity*, the claim "generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

There is a "limited exception" for when restitution in equity doesn't require identification of particular property in the defendant's possession:

"an accounting for profits." *Id.* at 214 n.2. An "accounting for profits [is] a remedy closely resembling disgorgement." *Liu v. SEC*, 140 S. Ct. 1936, 1940 n.1 (2020); *see also ibid.* (calling accounting for profits a remedy "parallel[]" to disgorgement). Accounting for profits (and disgorgement) permit the award of the wrongdoer's net profits caused by the wrongdoing to restore the victim to the *status quo ante. See, e.g.*, *id.* at 1940, 1943.[5]

ii.

The removal costs are most analogous to restitution *at law*. The Government isn't seeking particular property or funds in the defendant's possession caused by the wrongdoing. Nor is the Government seeking ERR's "net profits" caused by the oil spill. So the unjust-enrichment remedy here is akin to restitution *at law*.

Moreover, the Government's Recoupment Claim bears no resemblance to a tort action in equity. As the Supreme Court has explained, "a classic example" of relief given by a court of equity to remedy a tort was injunctive relief to abate a nuisance or to stop a trespass. *Tull*, 481 U.S. at 423. To be sure, sometimes a court of equity awarded monetary relief—but only incident to an injunction. *See id.* at 424 ("A court in equity was empowered to provide monetary awards that were incidental to or intertwined with injunctive relief."); *see also Tex. Advanced*, 895 F.3d at 1322

---

[5] In certain circumstances, disgorgement (and an accounting for profits) may still be a legal remedy, such as when the defendant's net profits are really used "as a '*proxy*' for actual damages in the form of lost profits or a reasonable royalty." *Tex. Advanced*, 895 F.3d at 1321 (emphasis added); *see also id.* at 1320 ("In some cases, a plaintiff seeking disgorgement as a remedy for trade secret misappropriation might prove that this measure of relief, though focused on the defendant's gains, is good evidence of damages in the form of the plaintiff's losses or of a reasonable royalty for use of the secret."); *TCL Commc'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, 943 F.3d 1360, 1372–74 (Fed. Cir. 2019) (concluding that a release payment was legal relief because it sought to estimate damages).

& n.9. Here, the Government never sought any form of injunctive relief. So its monetary claims are not incident to anything; they are the core of the Government's claims *at law*.

iii.

The Government doesn't dispute that the relief here is most like restitution at law as described in *Great-West Life*. Instead, its main argument is that *Great-West Life* is inapposite because it wasn't a Seventh Amendment case. That's both true and irrelevant.

In *Great-West Life*, Justice Scalia analyzed restitution's historical development from the pre-Founding era to the merger of law and equity[6]—the exact same inquiry Supreme Court precedent requires for the Seventh Amendment. Justice Scalia even compared his analysis in *Great-West Life* to the one required by the Seventh Amendment. *See* 534 U.S. at 217 ("It is an inquiry, moreover, that we are accustomed to pursuing, and will always have to pursue, in other contexts," including the Seventh Amendment's right to a civil jury.); *id.* at 213 ("[W]hether [restitution] is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought." (quotation omitted)). Thus, neither the correctness nor the persuasiveness of *Great-West Life*'s description of restitution at law and in equity turns on the particular context in which Justice Scalia performed it. And in any event, the Supreme Court has directed us to follow its "transsubstantive guidance on broad and fundamental equitable principles." *Liu*, 140 S. Ct. at 1944 (quotation omitted). So we're obligated to follow *Great-West Life*.

---

[6] Equity and law "merged" or "fused" in 1938. *See, e.g.*, *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 966 (2017); *see also* Fed. R. Civ. P. 2 ("There is one form of action—the civil action.").

No. 21-30028

We therefore hold that the Recoupment Claim sounds in law and hence triggers ERR's Seventh Amendment right to a jury.

2.

Next, the Subrogation Claim. This claim is intertwined with the Recoupment Claim, which requires a jury trial. In these circumstances, a jury trial is required on the overlapping issues to preserve the Seventh Amendment right. *See, e.g.*, *Beacon*, 359 U.S. at 508–10; *Dairy Queen*, 369 U.S. at 472–73; *Ross*, 396 U.S. at 537; *Tull*, 481 U.S. at 425 ("[I]f a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as incidental to the equitable relief sought." (quotation omitted)).

In any event, even if the claims were not intertwined, the Government's Subrogation Claim still triggers ERR's constitutional right to a jury trial. We first explain (a) that both the nature of the Government's action and the type of remedy sound in law. We then reject (b) the Government's counterarguments.

a.

We again start with the nature of the action and the type of remedy implicated by the Government's Subrogation Claim. Subrogation involves switching one plaintiff for another. *See US Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) ("Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party." (quotation omitted)). But it does not affect the underlying type of remedy; the new plaintiff gets the same remedy (legal or equitable) that the previous one could've gotten.

14

Even though subrogation originated in courts of equity, the equitable fiction of substituting the plaintiff for the original rightholder does not, standing alone, make a subrogation action equitable in nature for purposes of the Seventh Amendment. *See* Dan B. Dobbs, Law of Remedies: Damages, Equity, Restitution 411 (3d ed. 2018) [hereinafter Dobbs] ("Subrogation can be compared to an assignment of the creditor's rights to plaintiff, and sometimes subrogation is in fact referred to as an equitable assignment. The assignment, however, is made by the court, not by the parties." (quotation omitted)). That's because two Supreme Court decisions instruct that we should consider whether the *underlying claim* is legal or equitable.

The first decision is *Ross v. Bernhard*, 396 U.S. 531 (1970). There, stockholders brought a derivative suit in federal court against the directors of their closed-end investment company and the corporation's brokers. *Id.* at 531–32. The "derivative suit ha[d] dual aspects": (1) "the stockholder's right to sue on behalf of the corporation, historically an equitable matter"; and (2) "the claim of the corporation against directors or third parties on which, if the corporation had sued and the claim presented legal issues, the company could demand a jury trial." *Id.* at 538.

The Supreme Court concluded that the threshold equitable fiction did not foreclose a Seventh Amendment right to a jury trial. As the Court explained: "If [the action] presents a legal issue, one entitling the corporation to a jury trial under the Seventh Amendment, the right to a jury is not forfeited merely because the stockholder's right to sue must first be adjudicated as an equitable issue triable to the court." *Id.* at 539. That is, "the right to a jury should not turn on how the parties happen to be brought into court." *Id.* at 542 n.15. This principle was a natural consequence of the merger of law and equity because "[p]urely procedural impediments to the

15

presentation of any issue by any party, based on the difference between law and equity, were destroyed." *Id.* at 539–40.

Or consider *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990). There, an employee sued his union for backpay on the ground that the union breached its duty of fair representation. *Id.* at 561. To win, the employee had to prove two things: (1) his employer "breach[ed] the collective-bargaining agreement" and (2) the union breached its duty of fair representation. *See id.* at 569. The Court explained that the collective-bargaining-agreement issue was analogous to a breach-of-contract claim (legal) and the fair-representation issue was analogous to a trust action (equitable). *See id.* at 565–70.

Still, the Supreme Court held there was a right to a jury. As to the nature-of-the-action factor, the Court concluded that it was "in equipoise" because the action "encompasse[d] both equitable and legal issues." *Id.* at 570. As to the nature-of-the-remedy factor, the Court concluded that "the remedy of backpay sought in this duty of fair representation action is legal in nature." *Id.* at 573. With one factor neutral and one supporting a jury right, the Court held that the employees were "entitled to a jury trial on all issues presented in their suit." *Ibid.*

So too here. Subrogation is merely a procedural fiction created by courts of equity to allow suits involving underlying legal issues and legal relief to proceed. *See US Airways*, 569 U.S. at 97 n.5. The underlying claim here— *i.e.*, the "heart of the action," *Ross*, 396 U.S. at 539—is one that would have been brought in courts at law. It's either a claim identical to the Recoupment Claim or an ordinary breach-of-contract claim seeking monetary damages for the costs of cleaning up the spill. *See supra*, at 9–14 (explaining that the Recoupment Claim sounds at law); *see also AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1374 (11th Cir. 2021) ("The Seventh Amendment

applies here because breach of contract is a traditional action at law, and a money judgment, even if based on restitution, is generally a legal remedy."); *Bowen v. Massachusetts*, 487 U.S. 879, 917 (1988) (Scalia, J., dissenting). Given *Ross* and *Chauffeurs*, the nature of the action favors a right to a jury. And for the same reasons as the Recoupment Claim, the type of remedy does too.

b.

The Government's principal response is to compare its OPA claims to analogous actions under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). And the Government places great weight on authority outside this circuit interpreting CERCLA, which it contends should be extended to the OPA.

The Government mainly relies on *Hatco Corp. v. W.R. Grace & Co. Connecticut*, 59 F.3d 400 (3d Cir. 1995). The court's analysis in that case, however, hinged on the premise that restitution *always* sounds in equity. *See id.* at 412. Whatever the truth of that premise in 1995, it has been squarely foreclosed by subsequent Supreme Court precedent. *See Great-W. Life*, 534 U.S. at 212 ("However, not all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity."); *see also id.* at 215 (explaining "the well-settled principle that restitution is not an exclusively equitable remedy" (quotation omitted)). And as to CERCLA's analogue to the OPA claim for subrogation,[7] the *Hatco* court said nothing about *Ross* and *Chauffeurs*. *Hatco* is thus unpersuasive, and we decline to extend it.

---

[7] Contribution and subrogation are of a piece. *See* DOBBS, *supra*, at 414–15 ("The close relationship [between contribution and] subrogation can be seen in such a case

No. 21-30028

\*       \*       \*

We hold that the Seventh Amendment guarantees ERR's right to a jury trial of the Government's OPA claims. For the foregoing reasons, we REVERSE in part, VACATE in part, and REMAND for a jury trial.

---

because it would be equally possible to reason that *A*, having paid the debt that *B* owes in equity and good conscience, is subrogated to the creditor's claim against *B*.'").